IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 1, 2016

**IN RE DAYMIEN T.**

**Appeal from the Juvenile Court for Hawkins County**
**No. HJ-15-0570      Daniel G. Boyd, Judge**

_____

**No. E2015-02527-COA-R3-PT-FILED-JULY 27, 2016**

_____

The trial court terminated Father's parental rights on grounds of substantial noncompliance with a permanency plan and persistent conditions. The trial court also found that termination was in the child's best interest. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed and Remanded**

J. STEVEN STAFFORD, P.J.,W.S., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., and RICHARD H. DINKINS, JJ., joined.

Samuel E. White, Kingsport, Tennessee, for the appellant, Matthew T.

Herbert H. Slatery, III, Attorney General and Reporter; and Kathryn A. Baker, Assistant Attorney General; for the appellee, State of Tennessee, Department of Children=s Services.

**OPINION**

**Background**

On May 30, 2013, Petitioner/Appellee Tennessee Department of Children's Services ("DCS") filed a petition to find Daymien T. ("the child"), the minor child of Respondent/Appellant Matthew T. ("Father") and Respondent Michelle A. ("Mother")[1] dependent and neglected.[2] The petition also alleged that Father's paramour's children, who

_____

[1] Mother is not a party to this appeal.

[2] In cases involving termination of parental rights, it is the policy of this Court to remove the names of minor children and other parties in order to protect their identities.

were living in the home with Father, his paramour, and the child at the time, were dependent and neglected. The other children, however, are not at issue in this appeal.

According to the petition, DCS received a referral for improper supervision on May 23, 2013. Thereafter, it was discovered that Father and his paramour allegedly "locked the child[] in the room and [Father] urinated on [the child]," who was five at the time. The petition alleged that Father admitted to urinating on the child, but stated that he did so because the child urinated on the floor while locked in the room. Father's paramour also admitted to "grabbing the child by the neck and attempting to rub the child's nose in feces on the floor of the room in which he was locked with her two children." Father and paramour stated that they took this action because the child cut the other children's hair and urinated on the dog. Per the petition, the child admitted to cutting the other children's hair, but adamantly denied urinating on the dog. Father apparently informed DCS that he had custody of the child because Mother attempted to set the child on fire.

On the same day, May 30, 2013, the juvenile court entered an ex parte protective custody order removing the child from Father's home and placing him in DCS custody. The child was eventually placed in therapeutic foster care. Thereafter, on August 13, 2013, the juvenile court held an adjudicatory hearing on DCS's dependency and neglect petition. On October 30, 2013, the juvenile court entered an order finding clear and convincing evidence that the child was dependent and neglected and removing him from Father's and Mother's custody.

On June 11, 2013, the first permanency plan concerning the child was created. The plan was later ratified by the trial court and filed on August 13, 2013. Father participated in the formulation of the plan and was present at the ratification hearing. Over the next two years, four additional permanency plans were created by DCS and ratified by the trial court. Father signed each and every additional plan.

On June 30, 2015, more than two years after the child was taken into DCS custody, DCS filed a petition to terminate Mother's and Father's parental rights to the child. With regard to Father, the petition alleged two grounds for termination: (1) that Father has substantially failed to comply with the permanency plans and (2) that the conditions that led to the child's removal persisted. The trial court held a termination hearing on November 17, 2015. Mother did not appear.

Technical records from the dependency and neglect proceedings, including the order from the adjudicatory hearing finding the child dependent and neglected, and the various permanency plans ratified by the trial court, were all admitted as exhibits. Toni Jenkins, the child's family service worker with DCS, first testified about Father's compliance with the various permanency plans at issue. As discussed in more detail *infra*, the various plans contained many requirements related to Father's decision to improperly discipline the child

for his purported conduct. The requirements included, *inter alia*, attending anger management treatment and following recommendations, obtaining a parenting assessment and follow recommendations, and attend supervised and therapeutic visitation with the child, utilizing skills learned in treatment. Ms. Jenkins testified that Father made very little progress on most of the plan's requirements until after the termination petition was filed. Specifically, Father only attended visitation with the child sporadically and did not complete anger management, despite the fact that both tasks were clearly labeled as critical action steps on the permanency plans. Indeed, Father admitted that prior to the filing of the termination petition, he attended no more than four anger management sessions in the approximately twenty-five months prior to the filing of the termination petition. According to Ms. Jenkins, Father blamed the more than three hour distance between him and the child and his repeated vehicle trouble for his missed visits and failure to complete anger management. Ms. Jenkins pointed out, however, that Father chose to move more than three hours away after the child was removed from his custody.

The child's individual and family counselor, Teresa Fletcher, testified that she has been treating the child weekly since December 2013. Generally, Ms. Fletcher sees the child for individual therapy, but when Father is present, she, the child, and Father will participate in family therapy. Although Father was required to attend visitation at least once a month, Ms. Jenkins testified that Father was welcome to attend weekly sessions. According to Ms. Fletcher, however, from December 2013 to approximately six months prior to trial, Father's attendance at the therapeutic visitation was largely inconsistent. Ms. Fletcher testified that consistency in visitation is especially important for the child because he suffers from post-traumatic stress disorder relating to his prior abuse; due to the child's disorder, he is unable to appropriately cope with disappointment. As such, Ms. Fletcher testified that she has directed Father to stop making promises to the child that he does not keep. For example, Ms. Fletcher testified to an incident in June 2015 where Father promised the child that he would visit on his birthday, but did not follow through, apparently due to vehicle trouble. Ms. Fletcher testified that the child was "devastated" when Father did not visit on his birthday as promised.

According to Ms. Fletcher, although Father admitted to her that he urinated on the child as a punishment, as of May 2015, he continued to blame the incident on his paramour or "other things." As such, Ms. Fletcher concluded that Father did not understand that his behavior constituted inappropriate discipline. Ms. Fletcher explained that Father taking full responsibility for his wrongful actions is important because it impacts his future behavior. Ms. Fletcher also testified that she has been working with Father to make better decisions concerning what information he shares with the child and in helping Father understand the developmental level of the child.

Ms. Fletcher testified that while Father has made an effort to more consistently attend visitation in the last six months, the more the child has visited with Father, the more the

child's mental health has actually deteriorated. According to Ms. Fletcher, the situation has become so dire that the child is now experiencing suicidal ideations. In fact, Ms. Fletcher testified that the child, who was eight at the time of trial, recently tried to commit suicide by choking himself. The child also attempted to run away. Ms. Fletcher blamed the child's "erosion" on both his lack of permanency and the child's history of trauma. As Ms. Fletcher explained: "I think that my concern is that because [the child], as dad's involvement has increased and [d]ad's responsibility to be present is more expected, [the child] has been eroding. So I'm really concerned about trauma triggers and other things like that that may be contributing to his erosion." Finally, Ms. Fletcher offered the following testimony when asked if reunification was appropriate:

> Here's what I would say is that [the child] desperately needs permanency. And I'm concerned that it has taken this long to be able to make the few gains that we've made over the last six months. I mean, [the child] can't sit and languish in foster care for two more years while we try to work this out. He cannot tolerate it. In fact, I was so concerned about [the child's] well-being that I really recommended that we stop visits until this issue of permanency was addressed because [the child] is eroding so much I'm fearful that he will have to be hospitalized if he continues to erode. So his mental health is in jeopardy here. I have great concerns about how long it will take for reunification to happen. We're still doing family therapy and supervised visits and it's been two years. So the timing is critical. [The child's] psychological well-being is paramount. It is difficult because [the child] loves his dad and it's easy to see that there is a bond there. But [the child] doesn't have another year to wait.

Father testified that his decision to move more than three hours away from the child after his removal was necessary because he was homeless at the time and was not employed. When a friend offered to let Father stay with him and help him obtain a job, Father testified that he determined that it was his best option to be able to provide for his son. Despite obtaining steady factory employment approximately one month after moving away, Father testified that he had difficulty with his vehicle that he could not afford to fully repair. According to Father, vehicle trouble prevented him from attending anger management treatment and visitation with the child. However, Father also testified that he only experienced vehicle trouble "[o]nce every couple months." Father stated that he accidently placed one gas card provided by DCS in the trash and that another had fallen out of his pocket while he was "walking down the side of the highway for at least 30 miles with bags and the car seat, strapped to my back using my belt[,]" after experiencing vehicle trouble. Father testified that after he moved away from the child and obtained a job, he did not need

to entertain the notion of returning to the city where his child resided because he "had a job and nothing went downhill."

Father also admitted that he lied to DCS about his paramour being in his home with him after he moved, even though the permanency plan required that Father notify DCS of any changes to persons living in his home. Indeed, it appears that Father only admitted her presence when a DCS worker found the paramour hiding in the closet. Father testified, however, that he had previously told DCS that he was no longer in the relationship with the paramour. Father admitted that he now resides with the paramour and has a child with her. Father also denied that DCS had been unable to make contact with him for the first six months after the child was taken into DCS custody. Father testified, however, that he eventually "came back . . . when [he] could afford it."

Father testified that he understood that the punishment that he had inflicted on the child prior to his removal was wrong and that he deeply regretted his actions. According to Father, he has made many improvements in the last six months because he and his paramour have been enrolled in an intensive parenting program supervised by family service coordinator Carla Thompson with regard to their new child.

Carla Thompson testified that she had begun working with Father and his paramour in June 2015. Ms. Thompson provides in-home parenting services to at-risk families, meeting with Father and paramour in their home two to four times per month. The parenting assistance concerns Father's and the paramour's new child, rather than the child at issue in this case. Nevertheless, Ms. Thompson testified that since she began working with the couple, she has seen improvements in the cleanliness of their home with regard to pet odors and in their parenting skills, including learning what appropriate responses are to the child's behavior. Ms. Thompson testified that the couple was very cooperative and utilized her suggestions. Ms. Thompson admitted, however, that most of her interaction is with Father's paramour because of Father's work schedule. Ms. Thompson testified that the couple purchased a new vehicle within two weeks of working with her and had no more transportation issues. Before that time, however, Ms. Thompson testified that the couple missed two meetings because of vehicle trouble. Finally, Ms. Thompson testified that she has recently begun instruction with the couple on appropriate parenting skills and that it would be a "long term thing" before such instruction was completed. Indeed, Ms. Thompson testified that the program in which Father and his paramour are enrolled would be completed in six or seven months.

Father's paramour did not dispute that she had inappropriately punished the child, leading to his removal from the home. Father's paramour testified that through the intensive counseling with Ms. Thompson, she now knows that discipline should involve "no hitting, no yelling, [and] no shut doors."

At the conclusion of the trial, the trial court made a detailed oral ruling finding that both grounds for termination as to Father had been shown by clear and convincing evidence and that termination was in the best interest of the child. The trial court also terminated Mother's parental rights. The trial court entered a written order to that effect on December 11, 2015.[3] Father thereafter filed a timely notice of appeal to this Court.

## Issues Presented

Father raises three issues, which are taken from his brief and slightly restated:

1. Whether the trial court erred in determining that there was clear and convincing evidence to support termination of Father's parental rights on the ground of substantial noncompliance with a permanency plan as it relates to Father's child.
2. Whether the trial court erred in determining that there was clear and convincing evidence to support termination of Father's parental rights on the ground of persistent conditions as it relates to Father's child.
3. Whether the trial court erred in finding that termination of Father's parental rights was in the best interest of the child?

## Discussion

As recently explained by the Tennessee Supreme Court:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and

---

[3] We note that many of the trial court's oral rulings are not included in the written order eventually entered in this cause. Whether we may consider oral rulings in termination cases, even when incorporated by reference into written orders, has been a subject of some dispute in this Court. *Compare In re K.J.G.*, No. E2015-00087-COA-R3-PT, 2016 WL 1203800, at *4 (Tenn. Ct. App. Mar. 28, 2016) (holding that the trial court made insufficient findings of fact where it made an oral ruling and attached the findings to its written order) (citing *In re: Adoption of Muir*, No. M2002-02963-COA-R3-CV, 2003 WL 22794524, at *3 (Tenn. Ct. App. Nov. 25, 2003) ("Because of Tenn. Code Ann. § 36-1-113(k), trial courts cannot follow the customary practice of making oral findings from the bench and later adopting them by reference in their final order.")), *with* (Swiney J., dissenting) (indicating that he would revisit the holding in *Muir* and instead hold that such findings are adequate when "sufficiently detailed"). In this case, however, the order drafted by DCS and entered does not contain a reference to or incorporation of the trial court's oral ruling. As such, we have confined our consideration to the written ruling in this case. The findings of fact contained therein are adequate, but certainly do not contain the level of detail offered by the trial court in its oral ruling. We strongly encourage litigants, attorneys, and trial courts to ensure that all of the trial court's oral pronouncements are included in written orders, especially in termination cases.

state constitutions. ***Troxel v. Granville***, 530 U.S. 57, 65 (2000); ***Stanley v. Illinois***, 405 U.S. 645, 651 (1972); ***In re Angela E.***, 303 S.W.3d 240, 250 (Tenn. 2010); ***In re Adoption of Female Child***, 896 S.W.2d 546, 547–48 (Tenn. 1995); ***Hawk v. Hawk***, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. ***In re Angela E.***, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as parens patriae when interference with parenting is necessary to prevent serious harm to a child." ***Hawk***, 855 S.W.2d at 580 (quoting ***In re Hamilton***, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also **Santosky v. Kramer***, 455 U.S. 745, 747 (1982); ***In re Angela E.***, 303 S.W.3d at 250.

***In re Carrington H.***, 483 S.W.3d 507, 522–23 (Tenn. 2016) (footnote omitted).

Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." ***In re Jacobe M.J.***, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting ***In re W.B.***, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); ***In re D.L.B.***, 118 S.W.3d 360, 367 (Tenn. 2003); ***In re Valentine***, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. ***Santosky***, 455 U.S. at 769. Consequently, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); ***In re Valentine***, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." ***In re M.J.B.***, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." ***Id***. at 653.

In light of the heightened standard of proof in termination of parental rights cases, a reviewing court must modify the customary standard of review as set forth in Tennessee Rule of Appellate Procedure 13(d). As to the trial court's findings of fact, our review is de novo

with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. ***Jones v. Garrett***, 92 S.W.3d 835, 838 (Tenn. 2002).

When the resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues. *See* ***McCaleb v. Saturn Corp.***, 910 S.W.2d 412, 415 (Tenn. 1995); ***Whitaker v. Whitaker***, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. ***Walton v. Young***, 950 S.W.2d 956, 959 (Tenn. 1997).

## I.

As an initial matter, Father argues that neither the substantial noncompliance nor the persistent conditions ground for termination can be sustained in light of the fact that there is no order in the record adjudicating the child dependent and neglected "as regards" Father. Father contends that such an order is required by this Court's holding in ***In re Audrey S.***, 182 S.W.3d 838 (Tenn. Ct. App. 2005). In ***Audrey***, we held that the ground of persistent conditions, Tennessee Code Annotated Section 36-1-113(g)(3), can only apply where the record contains a "prior court order removing the child from the parent's home that was based on a judicial finding of dependency, neglect, or abuse[.]"***Audrey***, 182 S.W.3d at 874. Although Father admits that this requirement has never specifically been expanded to apply to the ground of substantial noncompliance with a permanency plan, Father contends that the requirement is equally relevant and that this Court should apply the prior order requirement to the substantial noncompliance ground.

Regardless of whether the prior order requirement in ***Audrey*** is applicable to the substantial noncompliance ground for termination,[4] we conclude that the record contains a prior dependency and neglect finding that is sufficient to constitute a prior "judicial finding of dependency, neglect, or abuse" under ***Audrey***. ***Id.*** at 874. Here, an October 30, 2013 order was entered as an exhibit in the termination proceedings. The order reflects that Father and his counsel were present for this hearing. In the order, the juvenile court specifically found that the children at issue were dependent and neglected within the meaning of the law. Unlike in ***Audrey***, this order did not result from a mere preliminary hearing, but instead was entered after an adjudicatory hearing in which the juvenile court was presented with evidence. The

---

[4] We specifically decline to address Father's argument that the requirement of a prior judicial finding of dependency, neglect or abuse should be equally applicable to the ground of substantial noncompliance.

*Audrey* Court clearly contemplated that an order entered after an adjudicatory hearing was a sufficient "judicial finding of dependency, neglect, or abuse" for purposes of the persistent condition ground for termination. *Id.* at 874.

We also reject Father's argument that the order does not find the child dependent and neglected "as regards" him. First, we note that Tennessee Code Annotated Section 37-1-102(b)(12) defines "[d]ependent and neglected child" as, *inter alia*, a child "[w]ho is suffering from abuse or neglect." Further, Tennessee Code Annotated Section 37-1-130 allows the juvenile court to make an appropriate disposition for the child "[i]f the child is found to be dependent or neglected." Nothing in these provisions specifically requires that a dependency and neglect findings must be made against or "as regards" to a specific parent. Even if that were the case, however, we conclude that such requirement has been met. Here, the juvenile court's October 30, 2013 order indicates that "mother" stipulated to the fact that the children were dependent and neglected. The order goes on, however, to also conclude that clear and convincing evidence supports a finding of dependency and neglect. Because any dependency and neglect "as regards" to Mother was determined by her stipulation, the dependency and neglect finding established by the evidence clearly applies to Father. Indeed, at the time that the child was taken into DCS custody, he was living in Father's home, rather than Mother's. As such, we conclude that the trial court was entitled to rely on the October 30, 2013 order of dependency and neglect as a "judicial finding of dependency, neglect, or abuse." *Id.* at 874.

## II.

Father next argues that the trial court erred in finding clear and convincing evidence that Father substantially failed to comply with the permanency plan. Tennessee Code Annotated Section 36-1-113(g)(2) provides one ground for termination of a parent's parental rights when "there has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4[.]" Further, Tennessee Code Annotated Section 37-2-403 provides, in relevant part:

> Substantial noncompliance by the parent with the statement of responsibilities provides grounds for the termination of parental rights, notwithstanding other statutory provisions for termination of parental rights, and notwithstanding the failure of the parent to sign or to agree to such statement if the court finds the parent was informed of its contents, and that the requirements of the statement are reasonable and are related to remedying the conditions that necessitate foster care placement.

The determination of whether there has been substantial noncompliance with a permanency plan is a question of law, to be reviewed on appeal de novo with no presumption of correctness. *In re Valentine*, 79 S.W.3d 539, 548 (Tenn. 2002). Termination of parental rights under Tennessee Code Annotated Section 36-1-113(g)(2) "requires more proof than that a parent has not complied with every jot and tittle of the permanency plan." *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). To succeed under Section 36-1-113(g)(2), DCS "must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *In re M.J.B.*, 140 S.W.3d at 656–57 (citing *In re Valentine*, 79 S.W.3d at 547; *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003)). Second, DCS must show that "the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *In re M.J.B.*, 140 S.W.3d at 657 (citing *In re Valentine*, 79 S.W.3d at 548–49; *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at * 12 (Tenn. Ct. App. June 3, 2003)).

Here, the record contains five permanency plans ratified and entered by the juvenile court. Father participated in the creation of the first parenting plan and thereafter signed documents outlining the termination criteria in the remaining four plans. Father's required responsibilities throughout the plans were extensive. Father was generally required to: (1) attend an alcohol and drug assessment and follow all recommendations; (2) attend anger management classes and follow all recommendations; (3) submit to and pass random drug screenings; (4) build and improve parenting through supervised visitation; (5) address age-appropriate parenting skills and discipline; (6) participate in family therapy with the child once per month; (7) regularly attend visitation of at least twice per month and engage in phone calls with the child; (8) not make promises to the child; (9) cooperate in a home study, including background checks; (10) provide monthly proof of employment to DCS; (11) provide DCS proof of stable housing; (12) pay child support as previously ordered of $20.00 per month; and (13) sign releases for DCS and generally update DCS regarding his progress, his employment, persons in the home, and his address should anything change. Later plans required that Father: (1) notify DCS of any significant relationship that he had that could impact the child; (2) complete a clinical parenting assessment and follow recommendations; and (3) demonstrate the parenting skills he had learned through visitation and family therapy, which was increased to twice per month. Of these responsibilities, some were labeled "critical" action steps, including that Father attend anger management and that Father obtain and demonstrate parenting and discipline skills through supervised visitation and family therapy. Ms. Jenkins testified that some requirements were labeled critical because they were "more severely needed because of the circumstances for the removal and the issues . . . we needed addressed immediately."

First, we note that there is no dispute that the requirements of the plan were reasonable and related to remedying the reasons for the removal of the child. There was also no dispute that Father was fully aware of his responsibilities under the plans. On appeal, however,

Father argues that he made a concerted effort to comply with the requirements of the plan, but was stymied by financial barriers that prevented him from giving DCS "*precisely* what they were asking for."

We agree that Father did comply with some of the plans requirements. First, it is undisputed that Father participated in random drug screenings and allowed home observations. Eventually, Father also provided DCS with accurate information about his paramour living in his home, as DCS discovered the paramour hiding in the closet during a home visit. After the filing of the termination petition, Father completed a clinical parenting assessment and testified without documentary support that he had also completed a mental health assessment. The most critical aspects of Father's responsibilities, however, are where his participation was most lacking.

First, Ms. Jenkins testified that while Father completed a parenting assessment, he failed to follow the recommendations that resulted from the assessment. Second, Ms. Jenkins testified that Father only inconsistently participated in anger management treatment and failed to provide DCS with any certificates showing his completion of treatment, a critical action step in the parenting plans. Ms. Jenkins testified that an anger management class was located directly across the street from Father's home, negating any concerns regarding Father's lack of transportation. Apparently, Father did begin sporadically participating in the local church's anger management program after the filing of the termination petition. Even Father admitted, however, that he still needed help with anger management. Ms. Jenkins also testified that she had never received any documentation regarding a mental health assessment.

Finally, Ms. Jenkins testified that Father failed to maintain consistent supervised and therapeutic visitation with the child, another critical action step he was required to complete under the plan. Ms. Jenkins explained that DCS provided Father with gas cards to help him attend the visitations, but that the gas cards were revoked when Father was unable to provide DCS with receipts as instructed and also claimed that he lost two of the cards. Ms. Jenkins explained that the gas cards were necessary because Father moved three hours away from the child's placement after the child was taken into custody. Ms. Jenkins also stated that she looked into other ways of providing transportation to Father, but none were feasible.

In addition, the child's counselor testified that Father did not participate "much" in therapy in 2014. Instead, Ms. Fletcher testified that Father's participation only increased in the last six months, around the time that the termination petition was filed. The child's counselor also testified that Father still made promises to the child that he did not keep; the child was particularly devastated when Father failed to keep a promise to the child on his birthday as late as June 2015.

Father asserted at trial and in his appellate brief that his failure to fully comply with the permanency plan stems from transportation issues. According to Father, he was required to move more than three hours away from his son because he was unemployed and homeless. After he became employed, however, Father testified that his visits were often prevented by vehicle trouble. We note, however, that nothing in Tennessee Code Annotated Sections 36-1-113(g)(2) or 37-2-403 requires that a parent's substantial noncompliance with a permanency plan be willful. Furthermore, Father agreed at trial that his transportation problems were compounded by the fact that he chose to move more than three hours from his child despite his protestations that he "can't live without" his son. Indeed, although Father testified that he only experienced car trouble "[o]nce every couple months," it appears that Father's visitations and other requirements under the permanency plan were frequently and repeatedly hindered by claimed vehicle problems. Furthermore, it appears that Father was able to resolve all of his transportation woes once the termination petition was filed.

Although Father made more progress on the requirements of the permanency plan after the filing of the termination petition, we conclude that Father largely failed to take any action for nearly two years after the child was removed from his custody, and his belated efforts were simply "too little, too late." *See In re K.M.K.*, No. E2014-00471-COA-R3-PT, 2015 WL 866730, at *6 (Tenn. Ct. App. Feb. 27, 2015) (holding that father's efforts after the termination petition was filed were "too little, too late"); *In re A.W.*, 114 S.W.3d 541, 546 (Tenn. Ct. App. 2003) (holding that mother's improvement only a few months prior to trial was "[t]oo little, too late"). Because Father failed to complete many requirements in the permanency plans prior to the filing of the termination petition and largely failed to complete any of the critical action steps even by the time of trial, we must agree with the trial court that Father substantially failed to comply with the permanency plans at issue.

## III.

Father next argues that the trial court erred in finding clear and convincing evidence to support the ground of persistent conditions. Persistence of conditions requires the trial court to find, by clear and convincing evidence, that:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
> (B) There is little likelihood that these conditions will be remedied at any early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3).

"A parent's continued inability to provide fundamental care to a child, even if not willful, . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008) (citing *In re T.S. & M.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *7 (Tenn. Ct. App. July 13, 2000)). The failure to remedy the conditions which led to the removal need not be willful. *In re T.S. & M.S.*, 2000 WL 964775, at *6 (citing *State Dep't of Human Servs. v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990)). "Where . . . efforts to provide help to improve the parenting ability, offered over a long period of time, have proved ineffective, the conclusion is that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *Id.* The purpose behind the "persistence of conditions" ground for terminating parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 461675, at *20 (Tenn. Ct. App. Oct. 13, 2008) (quoting *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3, 2008)).

Here, the trial court made the following findings with regard to this ground:

16. That the child was removed from the father's home because of physical and psychological harm to the child stemming from an incident whereby father admitted to urinating on the minor child as a form of punishment and the minor child was physically assaulted by the father's paramour [] when she grabbed the child by the neck and attempted to rub the child's nose in feces on the floor of the room in which the child had been locked into by his father.

17. That the conditions that led to the removal still persist. The father [] has not addressed the anger management and parenting issues that were present at the time of removal. Specifically, he has not complied with the mental health recommendations and has not completed an anger management class. Further, [Father] has not consistently participated in family therapy and has been unable to demonstrate an understanding of the child's post-traumatic stress diagnosis that was a result of the abuse. The father's paramour [] still resides in the home and she has not

- 13 -

completed any actions steps in permanency plans to address her involvement in the child's abuse.

18. The Court finds that the conditions with regard to the child's mental health still persist and have become worse since the child entered into State custody due primarily to the lack of involvement of his parents.

19. That there is little chance that those conditions will be remedied soon so that the child can be returned safely to the home of the father [] because for over two years, DCS made reasonable efforts to assist him in remedying his issues, to no avail.

20. That the continuation of the parent/child relationship with the father [] greatly diminishes the child's chances of being placed into a safe, stable and permanent home.

The evidence does not preponderate against the trial court's findings. First, the record shows that the child was removed from Father's home in May 2013 and placed in DCS custody. In addition, as previously discussed, the juvenile court entered an order on October 30, 2013 finding that the child was dependent and neglected. The child never returned to Father's home or custody after that time. Accordingly, at the time of trial in November 2015, the child had clearly been removed from Father's custody by an order of dependency and neglect for more than six months. *See **Audrey***, 182 S.W.3d at 874 (discussed in detail, *supra*).

Next, although it appears that Father has made some progress in remedying the conditions that led to the child's removal, we agree with the trial court that many conditions still persist that prevent the child from returning to Father's home at an early date. Specifically, it appears that Father has failed to fully address his anger management issues, a large part of why the child was removed from the home. It also appears that even as of August 2015, Father was minimizing his participation in the abuse that occurred and the child's resulting mental health issues. Furthermore, it is clear from the record that it was only around the time that the termination petition was filed that Father began to heed the advice of the child's therapist and social worker that Father make a consistent effort to maintain contact with the child. Finally, we note that Ms. Thompson testified that it would be a "long time" before Father completed parenting and anger management instruction. Indeed, Father is only a sporadic participant in this treatment as well, citing his work schedule.

Here, it may be true that Father has made some effort to change his situation for the betterment of the child. However, the undisputed evidence at trial paints an alarming picture of the child's degrading mental state. Ms. Fletcher testified that permanency for the child is of the utmost importance and must be achieved with haste if the child is to thrive, or even survive. Father had over thirty months at the time of trial to work on his parenting and anger

- 14 -

management issues in order to regain custody of his child, but has made little progress. There can be no dispute that more time would be required in order for the child to return to Father. Indeed, Ms. Fletcher testified Father was only able to make minimal gains in the six months that he has consistently participated in therapeutic visitation. Under these circumstances, we conclude that it is unlikely that Father will be able to remedy his anger management and parenting issues "at any early date so that the child can be safely returned to [him]." *See* Tenn. Code Ann. § 36-1-113(g)(3). The trial court's finding that clear and convincing evidence supports this ground is therefore affirmed.

## IV.

When at least one ground for termination of parental rights has been established, the petitioner must then prove by clear and convincing evidence that termination of the parent's rights is in the child's best interest. ***White v. Moody***, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). When a parent has been found to be unfit (upon establishment of ground(s) for termination of parental rights), the interests of parent and child diverge. ***In re Audrey S.***, 182 S.W.3d at 877. The focus shifts to the child's best interest. *Id*. Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest. *Id*. However, when the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child. Tenn. Code Ann. § 36-1-101(d). Further, "[t]he child's best interest must be viewed from the child's, rather than the parent's, perspective." ***Moody***, 171 S.W.3d at 194.

The Tennessee Legislature has codified certain factors that courts should consider in ascertaining the best interest of the child in a termination of parental rights case. These factors include, but are not limited to, the following:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to affect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). This Court has noted that, "this list [of factors] is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M. A. R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Depending on the circumstances of an individual case, the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis. *In re Audrey S.*, 182 S.W.3d at 877. As explained by this Court:

> Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*In re Audrey S.*, 182 S .W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194).

Here, the trial court was particularly troubled by the issue of best interest, chiefly because of Ms. Fletcher's testimony that the child's erosion is in part due the child's

understanding that he may not be returned to Father. Nevertheless, the trial court determined that termination of Father's parental rights was in the child's best interest because Father had not "made lasting changes in [his] lifestyle or conduct after reasonable efforts by the State to help, so that lasting change does not appear possible." *See* Tenn. Code Ann. § 36-1-113(i)(1) & (2). The trial court also found that no meaningful relationship exists between Father and the child, *see* Tenn. Code Ann. § 36-1-113(i)(4), and that Father has "shown little or no interest in the welfare of the child." *See* Tenn. Code Ann. § 36-1-113(i)(1)(3) & (6).

We have less difficulty determining that termination of Father's parental rights is in the best interest of the child. Here, Father admitted to participating with paramour in abusing the child by locking him in a room with no restroom access, then punishing him quite horribly for the logical consequences of his and the paramour's own parenting decisions. While Father expressed great remorse at trial, it appears that he failed to fully understand the wrongfulness of his actions as of August 2015, years after the incident and after extensive mental health, parenting, and anger management treatment was made available to him. Father also chose to move more than three hours away from his child, though that move may have been precipitated by Father's circumstances. What is troubling, however, is that even after Father was made aware that it was necessary for his son's mental health that he attend visitation consistently, he never once entertained the idea of moving closer to his son, even as he allegedly began experiencing constant transportation difficulties.

Finally, and most importantly, it cannot be minimized that the more time that Father has spent with the child, the more the child's mental health has deteriorated. Clearly, Father's increased involvement in the child's life has not led to better outcomes for the child, but in fact, has led to a worsening of the child's mental health. Indeed, the issues became so frightening to the child's counselor that she recommended terminating visitation. As the trial court remarked:

> It's very concerning as to where [the child] is as we speak today from a mental health standpoint. It's very concerning. An eight-year old having suicidal ideations is absolutely disgusting and scary. . . . I sit here and think about him even conjuring up and understanding what that means is just absolutely terrifying, and he has to be in a terribly dark place to even know that he is able to do that or to even think about that. That's just absolutely scary.

Here, Ms. Fletcher testified that the child's erosion was based upon the prior trauma experienced by the child at Father's hands, Father's inconsistency in visits, and the "uncertainty of permanency that has escalated with, of course, termination and the litigation." Denying termination of Father's parental rights at this point would only lead to more uncertainty, as the child cannot presently return to Father's home given the little progress

Father has made in complying with the permanency plans in place. As such, even if we were to assume that Father would continue making progress, giving Father a "second chance," as he so desperately requested at trial, would only serve to hurt this already emotionally battered child further. Because it is in the child's best interest to move toward a more permanent placement, we agree with the trial court that termination of Father's parental rights is in the child's best interest.

### Conclusion

The judgment of the Hawkins County Juvenile Court is affirmed and this cause is remanded to the trial court for further proceedings consistent with this Opinion. Costs of this appeal are taxed to Appellant Matthew T., for which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE