FILED
04/16/2020
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 4, 2020

**IN RE MADUX F.**

**Appeal from the Juvenile Court for Roane County**
**No. 2019-JC-25      Terry Stevens, Judge**

_____

**No. E2019-01535-COA-R3-PT**
_____

This is an appeal of an order terminating a mother's parental rights. The trial court found that three grounds for termination were proven against the mother and concluded that terminating her rights was in the minor child's best interests. Although we vacate one ground for termination due to the trial court's failure to consider all required elements of the statutory ground, we otherwise affirm the termination order.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the court, in which JOHN W. MCCLARTY and W. NEAL MCBRAYER, JJ., joined.

Jason R. Hines, Kingston, Tennessee, for the appellant, Tiffany S.

Herbert H. Slattery, III, Attorney General and Reporter; Lexie A. Ward, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**BACKGROUND AND PROCEDURAL HISTORY**

Appellant Tiffany S.[1] ("Mother") is the mother of the minor child at issue in this appeal. The Appellee is the Tennessee Department of Children's Services ("the Department"). As is clear from our review of the record, the present litigation is not the first time the Department has gotten involved in the lives of Mother and the minor child.

---

[1] This Court has a policy of protecting children's identities in parental termination cases. Therefore, when appropriate, we will present certain names by their initials.

*The Department's initial involvement and the child's removal*

On a previous occasion, the child was removed from Mother's care and eventually placed with temporary custodians. This first instance of the Department's involvement was a result of Mother's having drug issues. The record reflects that the temporary custodians ultimately released custody of the child to their son,[2] who subsequently wanted to release custody of the child to Mother. Although Mother was not then found to be in compliance with certain court requirements, she was nonetheless given a temporary trial home placement.

This trial home placement directly precipitated the Department's present involvement. On March 5, 2018, after Mother was shown to still not be in compliance with the requirements of a previous court order, the trial home placement was revoked by order of the Roane County Juvenile Court ("the trial court"), and custody of the child was placed with the Department. A subsequently-entered family permanency plan specifically detailed Mother's noncompliance as the basis for placing the child in the Department's custody, and it emphasized her failure to stay drug-free, among other concerns:

> The court did give [Mother] a 60-day temporary trial home placement to come in compliance. The trial home placement was revoked due to her inability to come into compliance with the court. The previous custodian was not present in court. Therefore, the court placed [the child] into the Department of Children[']s Services['] custody. [Mother's] inability to provide negative drug screens for at least a 6 month period, stable housing and a safe environment for [the child] are major concerns.

The child was later adjudicated dependent and neglected by an order entered on April 2, 2018.

The record reflects that two permanency plans were entered in the wake of the child's removal. The first permanency plan, which was created on March 27, 2018 and later ratified on April 16, 2018, placed a number of requirements on Mother. At the forefront of concern was Mother's ability to remain free from drugs and provide a safe home. The specific responsibilities of Mother under the plan were as follows: resolve legal issues and not incur any new charges; complete a mental health and alcohol and drug assessment and follow all recommendations; submit to a hair follicle or nail bed test; submit to random drug screens and pill counts; have drug screens with negative results;

---

[2] Although the record does not shed light on the specific identities of the temporary custodians, it appears that the referenced temporary custodians may have been Mother's parents. The record does indicate that the "son" to whom the child was released prior to the trial home placement was Mother's brother.

maintain housing and comply with random home visits by the Department and service providers; participate in meetings, court hearings, and appointments; obtain and maintain legal income; pay child support; and participate in parenting classes and demonstrate parenting skills.

The second permanency plan, which was created on September 3, 2018 and ratified on October 15, 2018, contained some of the same requirements as the first plan, but it also added new requirements, including the following: provide transportation to and from visits; provide diapers, snacks, and other items as directed by the visitation supervisor; be on time to visits; refrain from discussing adult matters at visits; refrain from using foul language at visits; complete applications for housing; provide proof of housing; provide receipts of paid monthly rent or mortgage and utilities; develop a transportation plan; submit proof of employment or source of income; and maintain contact with the Department and provide updates as to changes in address, telephone, and employment.

Despite efforts on the part of the Department, Mother's drug problems, among other concerns, continued, and a termination petition[3] was later filed on February 8, 2019. The petition to terminate Mother's parental rights alleged three grounds for termination against her: abandonment by failure to provide a suitable home,[4] substantial noncompliance with permanency plan,[5] and persistent conditions.[6] The petition also averred that the minor child's best interests supported termination.

*The trial*

A hearing was held on August 1, 2019, at which time the Department presented a number of witnesses and documentary evidence. For her part, Mother did not present any proof at trial. In order to better convey the problems that manifested themselves in this case and Mother's general failure to deal with them, a detailed account of the proof offered at trial through the Department's witnesses is provided below.

The first witness to testify was Monica Hughes, a counselor and family support specialist with WestCare of Tennessee. Ms. Hughes reported that Mother had been referred for services based on substance abuse issues and for having attempted to use someone else's urine sample during a drug screen. Ms. Hughes stated that Mother had missed her initial appointment and was late when it was rescheduled. According to Ms. Hughes, Mother reported having a history of polysubstance abuse, but at the onset of Ms.

---

[3] In addition to Mother, other individuals were named as respondents in the Department's petition. Those other respondents are not parties to this appeal.

[4] *See* Tenn. Code Ann. § 36-1-113(g)(1); Tenn. Code Ann. § 36-1-102(1)(A)(ii).

[5] *See* Tenn. Code Ann. § 36-1-113(g)(2).

[6] *See* Tenn. Code Ann. § 36-1-113(g)(3).

Hughes' involvement, methamphetamine was the main problem. Ms. Hughes also stated that Mother had been diagnosed with borderline personality disorder and bipolar disorder.

Ms. Hughes testified that she and Mother had a conversation about the incident where Mother used another individual's urine sample. Ms. Hughes stated that Mother had admitted to this act. Although Mother had expected the urine she used would be clean, it turns out it was not.

Ms. Hughes testified that, following intake, she completed a drug and alcohol assessment for Mother. At the time of the assessment, Mother reported she was injecting approximately an "8-ball" of methamphetamine per day.[7] It was recommended from the assessment that Mother attend a residential treatment program to address her issues.

Although Mother did not believe she needed as intense treatment as had been recommended, Ms. Hughes testified that she went ahead to provide outpatient services while trying to assist Mother in receiving inpatient treatment. In elaborating on the specific details of Mother's recommended residential treatment, Ms. Hughes testified as follows:

> The residential, meaning a minimum of nine to 12 months of inpatient treatment, which can be a combination of 28 to 90 days inpatient, halfway houses, partial hospitalizations. It all depends on -- she would have -- as in Buffalo Valley, they would do a reassessment once she got there to determine level of care and their programs that they would place her in.

Ms. Hughes testified that Mother only attended four out of nine scheduled appointments and was late to every single appointment she attended. Regarding the missed appointments, Ms. Hughes testified as follows:

> Most of those were no-call, no-shows, or she would call me or text me 30 minutes to an hour, sometimes later, stating that she wouldn't be able to make the appointment or that she had forgotten about the appointment.

Ms. Hughes also testified that Mother reported using drugs at various times during this period. Despite Ms. Hughes' efforts to get Mother to attend inpatient treatment, she claimed that Mother reported not needing that level of care. Ms. Hughes' services were

---

[7] As referenced by many opinions, it appears that the term "8-ball" is slang used to describe one-eighth of an ounce, or at least 3 grams, of a drug. *See State v. Clanton*, No. M2015-02438-CCA-R3-CD, 2016 WL 5266548, at *2 (Tenn. Crim. App. Sept. 21, 2016) (likening "8 ball" to "approximately 3 grams of crystal meth"); *State v. Johnson*, No. M2010-02086-CCA-R3-CD, 2012 WL 1900137, at *2 (Tenn. Crim. App. May 25, 2012) (noting that witness described "ball" as "slang for an 'eight ball' or an eighth of an ounce" and that an "eight ball" was "approximately 3.5 grams").

terminated in September 2018 due in part to Mother's noncompliance. Ms. Hughes reported, however, that WestCare received another referral about Mother in April 2019.

The next witness to testify was Sonya Gibson. Ms. Gibson was also employed by WestCare and had received the April 2019 referral for Mother. According to Ms. Gibson, Mother reported that she had reduced her substance abuse. Yet, by the end of May 2019, Ms. Gibson was recommending inpatient treatment based on Mother's continued usage of drugs.

Regarding Mother's compliance with WestCare's services as a result of the April 2019 referral, Ms. Gibson testified as follows:

> The first month there were two no-shows. The second month was two no-shows. The last month she was starting to make her visits; there was still one no-show, I believe. As far as the commitments on making the phone calls in between visits for getting into rehab and trying to get help with things like that, making those commitments, it was kind of half-done but not fully committed to it.

According to Ms. Gibson's knowledge, Mother arrived in rehab on July 15, 2019, and she testified that Mother did not have her own housing.

Following Ms. Gibson's testimony, the trial court heard from Andrea Mathews, a former employee at Omni Community Health. Ms. Mathews testified that she became involved with Mother in March 2018 when she was assigned to do therapeutic visits for Mother and the minor child. Ms. Mathews stated that she also was assigned "to do the parenting curriculum for [Mother] as well."

According to Ms. Mathews, out of the thirty-two hours of visits that she was authorized to facilitate between March and June 2018, Mother only showed up for a total of five hours. Mother had problems showing up on time for the visits she attended, and when the first visit was canceled because Mother was late, she became angry. As Ms. Mathews described it, "I did presently see eyes – on [Mother]. She was very mad. She cussed out DCS, she cussed out the foster mom, and she said that it wasn't right that her visit was canceled."

This type of behavior on Mother's part was not atypical. Ms. Mathews stated that Mother often "came in angry" to visits and seemed to not understand why she needed therapeutic visits. Yet, whereas Mother expressed to Ms. Mathews that she could handle the child, Ms. Mathews observed that Mother "did not seem to know how to parent." Moreover, despite repeated instruction to bring a diaper bag to visits, Ms. Mathews stated that Mother never did so.

Regarding the parenting classes that she was assigned to facilitate, Ms. Mathews testified that those were not done while she provided services:

> We never actually made it to the parenting classes. The mother would not give me a time. We tried to make it right after the visits, and she didn't understand why she couldn't have more time with her child instead of having to do a parenting class, because she said she had other children and understood how to parent.

Following Ms. Mathews' testimony, Brandi Lawson was called as a witness. Ms. Lawson testified that she was a family service worker for the Department, and she represented that Mother has had continuous issues with the Department. She testified that this was the minor child's second time in custody and mentioned that the child's first time in custody had also been due to drug issues. Whereas a permanency plan had also been entered in connection with the first episode, Ms. Lawson indicated that Mother had not been in compliance with the steps on that permanency plan.

Although Mother had a hair follicle test scheduled early on in this case, Ms. Lawson testified that the test had to be rescheduled due to the fact that Mother had been arrested. According to Ms. Lawson, Mother had reportedly sold pills or drugs to an undercover police officer. When Mother later completed the rescheduled hair follicle test, she tested positive for amphetamines and methamphetamines.

When asked what initial steps were taken to assist Mother, Ms. Lawson responded as follows:

> I know [another worker at the Department] had set up Omni Community Health. That was put in place for the visitation and also to assist with the parenting classes. There was a referral that was already put in from FSW Dugger for Covenant Counseling to do an alcohol and drug assessment, which was completed on March the 24th, and it recommended that mom do intensive outpatient and like partial hospitalization.
>
> We also went ahead and done another request -- well, mom said that she wanted to go to Ridgeview because she had a history at Ridgeview. She also had an assessment done at Ridgeview as well. That was done in March. The Department -- we submitted one for WestCare, who also done another alcohol and drug assessment, and you heard their recommendations when they were here.

Ms. Lawson also stated that the Department had continued to make visitation requests through Omni up until March 2019 and that the Department had made offers to assist Mother with her transportation issues.

Efforts were also made to ensure that Mother could find stable housing. As to this issue, Ms. Lawson stated, "[W]e of course tell everyone we can offer the first month's rent or help out with furniture. We also gave her a resource guide for Roane County." Ms. Lawson further testified that she made Mother aware of the Pathways program, which helps the homeless population.

Although visits between Mother and the child were facilitated, Ms. Lawson testified that Mother's last visit with the child had been in February 2019 and, before that, in September 2018. When asked if she knew why Mother had stopped visiting after September, Ms. Lawson testified as follows:

Well, in August she was involved in a serious accident on -- I believe it was August the 29th, and she was injured. She was hospitalized, discharged on November -- well, September 4th. And then we had a visit in September. She had two successful visits in September.

On October 12th the visit was cancelled because [the child] was sick, and then another one was set up on October 27th, which mom didn't confirm, so we had that pol -- rule; we had made it for four hours prior to the visit that she needed -- instead of 15 minutes, she needed to call four hours prior to the visit time to say if she was going to come or not. And she didn't confirm, so that visit was canceled.

She was in jail in November. It was sporadic. It wasn't like a consistent thing. But she was in jail, so there was no visits.

And then there were no visits in December. One time she said that her car broke down, one of the cars broke down, and she wasn't able to make it, and then she was a no-show.

Regarding the month of January, Ms. Lawson testified that Mother was stuck on the side of the road for one visit, and on another occasion, a visit was canceled when Mother was late.

Ms. Lawson described Mother as "very difficult to deal with," stating that Mother would call and cuss her out. She testified that Mother did not feel like she needed the alcohol and drug treatment and claimed that calls had to be ended during several Child and Family Team Meetings due to the fact that Mother was yelling and screaming.

Unfortunately, drugs remained a serious problem in Mother's life. Ms. Lawson testified that Mother had not made any real improvement regarding drugs since the start of the case, and as already noted, she stated that Mother had been resistant to getting the

treatment everyone recommended. Mother had admitted to using drugs on several occasions, and random screens revealed positive tests for many drugs. On one date, for instance, Mother tested positive for amphetamines, meth, suboxone without a prescription, and THC. On another date, Mother tested positive for these same drugs, along with ecstasy. Ms. Lawson also testified to an incident where Mother attempted to evade the testing procedures: "[She was caught] with a bottle in her vagina, trying to use someone else's pee. But at that time she admitted to using meth. She said she was using an 8-ball every two to three days."

Mother continued to test positive for drugs in the year leading up to the trial, as Ms. Lawson confirmed in her testimony:

> There was a drug screen done -- well, she admitted that she would test positive on October 15th to Rox -- using Roxies and she would test positive for Suboxone without a prescription. A drug screen was done on 2/11, and she tested positive for Suboxone without a prescription, amphetamines, and meth. And then last month she tested positive for meth and amphetamines and THC and Suboxone without a prescription.

Ms. Lawson testified that she was never able to obtain a clean drug screen from Mother.

In addition to Mother's struggles with drugs, concerns existed as to her housing situation and employment. At the time the child was removed, Mother was staying in an apartment on Roane State Highway, but Ms. Lawson testified that Mother did not ultimately maintain that housing because she got arrested and "wasn't able to work and pay the rent." According to Ms. Lawson, Mother's housing situation thereafter was inconsistent, as Mother stayed variously in Kingston, Lenoir City, Harriman, and Jamestown.

Mother was employed at a Waffle House in Lenoir City at the time of the child's removal into the Department's custody, and although she lost that job when she was arrested, Ms. Lawson testified that Mother ended up working there again until August 2018. Mother had reported some other work involving cleaning houses, but Ms. Lawson testified that the cleaning work was "short-lived," that Mother had never provided documentation of it, and that Mother did not get paid for it. Ms. Lawson claimed Mother had not reported any other employment to her. Despite being ordered to pay a hundred dollars per month in child support, Mother only paid a total of eighty-six dollars in child support.

When Ms. Lawson attempted to help Mother with her drug problem by providing a list of different inpatient facilities, Mother was dismissive of the recommended treatment. As Ms. Lawson recounted at trial:

It's been, you know, she doesn't feel like -- she didn't feel like she needed the treatment. She said that when she was sober for a period of time prior to this custodial episode, she was able to do that on her own. She just really didn't feel like, you know, that intensive treatment was needed.

Ms. Lawson also testified that another worker had done "a lot" of work attempting to get Mother into treatment. Ms. Lawson testified that Mother was found to be not in substantial compliance at an October 15, 2018 permanency plan hearing, and she stated that nothing had changed since that date, save for the fact that Mother was in treatment at the time of trial.

Ms. Lawson testified that the child had been in a foster home since he entered custody in March 2018, and she stated that this placement was the same home he had been in during a prior removal. Ms. Lawson reported that the minor child was "very attached" to the foster family and was "very bonded and happy." She stated that he referred to them as "Mommy and Daddy" and went about the house saying, "This is my brother; This is my sister." According to Ms. Lawson, the home was preadoptive.

Although Ms. Lawson stated that the child had some stuttering issues when he came into custody, she testified that the issues had "gotten better." She further reported that the child exhibited behavioral problems following his last visit with Mother in February 2019, which resulted in the ending of visitations with Mother. As for the relationship between Mother and the child, Ms. Lawson testified that the child did not ask for Mother, and when reflecting on certain phone calls she had tried to facilitate, she stated as follows: "I was like: Let's have a phone call, you know. And she would get on the phone and she would talk to him, but he was just all over the place and didn't identify her as, you know, Mommy."

The proof showed that Mother's recent entry into rehab was paired with a plan for an eight-month halfway house stay afterwards. When asked if it would be detrimental to remove the child from his foster home and place him back with Mother after that passage of time, Ms. Lawson replied, "Yes; very."

Ms. Lawson stated that there had been continuous issues with Mother abusing drugs in this case and that there had also been issues with her being arrested. Although she testified that Mother's attitude had improved some by the time of trial, she observed that the change coincided with the removal of another child of Mother's that previous spring.

Regarding Mother's transportation issues, Ms. Lawson testified that Mother did not have a license,[8] and she stated that Mother was still "working on some legal stuff."

_____

[8] Although not specifically stated, in the context of Ms. Lawson's testimony, the implication is

- 9 -

She also considered Mother to be homeless, stating that, "When she wasn't in jail, she just stayed here, there, you know, a little bit of everywhere." Ms. Lawson testified that Mother had never provided an address for stable housing. Moreover, at the time of trial, Ms. Lawson did not have evidence of any employment for Mother that could be verified.

The last witness to testify was Miranda R. ("Foster Mother"), the foster mother for the child at issue. At the time of trial, the child had been with Foster Mother for about a year and five months. He had also been in Foster Mother's home on a prior occasion, for a period of approximately three months. Foster Mother testified that her home consisted of her, her husband, four biological children, and the child at issue. She testified that the child's relationship with her other children and her husband was "Great." She further testified that her home was preadoptive and that the minor child refers to her and her husband as "Mom" and "Dad." According to her, the minor child did this on his own.

*Ruling and Disposition*

Upon the conclusion of the proof, the trial court orally ruled that Mother's parental rights should be terminated upon all grounds alleged against her in the Department's petition. It also ruled that termination was in the child's best interests, offering the following analysis in reference to the best interest factors under Tennessee Code Annotated section 36-1-113(i):

> [Mother] has taken a step towards changing her circumstance; however, the Court finds that she has made -- as far as any sort of actual change or lasting change, that she has not made any adjustment of her circumstance to date regarding the substance abuse issue, housing, ability to provide any sort of legal source of income or support to provide for the child.
>
> . . . .
>
> [T]he Department had made reasonable efforts for approximately 14 months prior to her making any progress whatsoever to address the issues, and the Court would also note that up until the last two weeks prior to this hearing, that she had made no substantial step, if any, to address the underlying substance abuse issue, which is the primary cause for the child's removal, and that she still has a week or two to go to even complete that, which she can voluntarily leave at any point in time, and also that she has a significant period of time in order to actually complete the intensive outpatient or halfway house requirement of her prior recommendations.

that Mother still did not have a "driver's" license.

The Court does not -- accordingly finds that it does not appear reasonably possible for such an adjustment to be made at this time.

As to . . . whether the parent . . . has maintained regular visitation or other contact with the child, the Court finds that . . . [Mother] did not have regular visitation while she was allowed, and then the other contact would have been the phone calls that she was allowed to after the Court found that the visitation was detrimental to the child, but it still allowed the open-door phone calls, which she did not take advantage of.

So the Court finds that ground 3 also tends to lean toward that it's in the best interest of the child for the rights to be terminated.

. . . .

The Court does find that there was a meaningful relationship between the child . . . and the mother at the time the child was removed and that that did persist for some time, but it has been a substantial period of time since the child and the mother have had any contact.

The Court finds that [this consideration] . . . it's kind of not conclusive either way as to [Mother].

The fifth category, the effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition, the Court finds that the testimony makes it quite clear that at this point in time, if the child is removed from the foster parents, that will have a significant detrimental effect on at least the child's emotional and maybe psychological condition of the child, but there is no testimony, expert testimony, to get the psychological, but the Court clearly finds that it would have a detrimental effect on the child's emotional condition.

Whether the parent . . . has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child . . . the Court will note . . . the child was dependent/neglected in [her] care, and subsequently there's been a child removed from -- a separate child removed from the care of [Mother].

So the Court would find that, as to ground 6, that that does tend to lend that it's in the best interest of the child to terminate . . . rights.

Number 7, whether the physical environment of the parent's . . . home is healthy and safe, whether there is criminal activity in the home, or

whether there is such use of alcohol or controlled substances or controlled substance analogs as may render the parent or guardian consistently unable to care for the child in a safe and stable manner, there is no proof that -- the proof is, is that [Mother] does not have a stable home; that her home, for whatever reason, is not allowed to be viewed, due to her refusal to allow the Department and others to come to whatever residence she was staying at.

The Court also states that the controlled substance issues, though she's taken a step to address those, there is no proof that those have been addressed or that any treatment program has been completed. Everything other than that, the Court would have to conjecture and speculate as to whether or not [Mother] would successfully complete that, to address that in her favor.

. . . .

Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child . . . the Court notes that it was recommended that she do co-occurring mental health and alcohol and drug assessment, and at this point in time the Court's not in a position to really make a finding for or against [Mother] as far as that ground[.]

. . . .

Considering all of those factors, the Court finds by clear and convincing evidence upon the facts previously found and the application of those best interest criteria established in the statute that there is clear and convincing evidence that . . . the parental rights of [Mother] . . . should be forever severed and terminated[.]

A formal order terminating Mother's parental rights was subsequently entered by the trial court on August 29, 2019. This appeal followed.

## ISSUES PRESENTED

Mother's appellate brief raises a number of specific issues for our review. Restated nearly verbatim, they are as follows:

1. Whether the trial court's findings of fact regarding the removal of the minor child are supported by the facts in the record.
2. Whether the trial court erred in finding there were grounds to terminate the Mother's parental rights based upon abandonment under Tenn. Code Ann. § 36-1-102(1)(A)(ii).

3. Whether the trial court erred in finding that the petitioner had proven persistent conditions and noncompliance with the permanency plan by clear and convincing evidence.
4. Whether the trial court erred in shifting the burden to the Mother to prove that the grounds for termination were not met instead of requiring the petitioner to prove its grounds.

We note that in any termination of parental rights appeal, however, our review is not circumscribed by the specific concerns uplifted by an appealing parent in his or her appellate brief. As the Tennessee Supreme Court has made clear, in order to help "ensure that fundamental parental rights are not terminated except upon sufficient proof, proper findings, and fundamentally fair procedures," we are required to review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interest. *See In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016) ("[I]n an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal.").

**STANDARD OF REVIEW**

"A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the due process clauses of the federal and state constitutions." *In re M.L.P.*, 228 S.W.3d 139, 142 (Tenn. Ct. App. 2007). "Although this right is fundamental and superior to claims of other persons and the government, it is not absolute." *In re J.C.D.*, 254 S.W.3d 432, 437 (Tenn. Ct. App. 2007). "It continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). In this State, "[w]ell-defined circumstances exist under which a parent's rights may be terminated." *In re Roger T.*, No. W2014-02184-COA-R3-PT, 2015 WL 1897696, at *6 (Tenn. Ct. App. Apr. 27, 2015). Parties who have standing to seek the termination of a parent's parental rights must prove two things under the Tennessee Code. They must first prove at least one of the statutory grounds for termination. *In re J.C.D.*, 254 S.W.3d at 438 (citing Tenn. Code Ann. § 36-1-113(c)(1)). Second, they must prove that termination of parental rights is in the child's best interests. *Id.* (citing Tenn. Code Ann. § 36-1-113(c)(2)).

Because the decision to terminate a parent's parental rights has "profound consequences," trial courts must apply a higher standard of proof in deciding termination cases. *In re M.L.P.*, 228 S.W.3d at 143. "To terminate parental rights, a court must determine that clear and convincing evidence proves not only that statutory grounds exist but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). "Clear and convincing

- 13 -

evidence is evidence that eliminates any substantial doubt and that produces in the fact-finder's mind a firm conviction as to the truth." *In re M.A.B.*, No. W2007-00453-COA-R3-PT, 2007 WL 2353158, at \*2 (Tenn. Ct. App. Aug. 20, 2007). This heightened burden of proof "minimizes the risk of erroneous decisions." *In re M.L.P.*, 228 S.W.3d at 143.

Due to the heightened burden of proof required under the statute, we must adapt our customary standard of review. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). "First, we must review the trial court's specific findings of fact de novo in accordance with Tenn. R. App. P. 13(d)." *In re M.J.B.*, 140 S.W.3d at 654. "Second, we must determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements required to terminate a biological parent's parental rights." *Id.*

## DISCUSSION

As already noted, we are required by Tennessee Supreme Court precedent to "review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d at 525. Before turning our attention to the specific grounds for termination relied on in this case and what the child's best interests dictate, however, we begin our discussion by focusing on Mother's raised concerns. Although some of Mother's articulated issues no doubt relate to the grounds for termination that we will explore more fully later in this opinion, we find it prudent to first separately address the narrow concerns she raises.

### *Mother's raised concerns*

As a preliminary issue, Mother criticizes the trial court's finding about the circumstances of the child's removal, namely the finding that the "child was in the custody of the Department due to drug exposure and was removed from a home on Roane State Highway at the time of the removal." Although Mother argues that this finding is not supported by the record, we disagree. Evidence presented at trial clearly supports the trial court's finding. First, we observe that the bench order placing the child in the Department's custody reflects that Mother's trial home placement was revoked due to her continued noncompliance with court orders from the first removal episode. It is readily apparent from the record that such noncompliance involved Mother's long-standing problems with drugs. Indeed, as outlined earlier in this opinion, the permanency plan created in March 2018 stated as follows when describing the conditions that led to the child's removal:

> The court did give [Mother] a 60-day temporary trial home placement to come in compliance**. The trial home placement was revoked due to her inability to come into compliance with the court**. The previous custodian

- 14 -

was not present in court. Therefore, the court placed [the child] into the Department of Children[']s Services['] custody. **[Mother's] inability to provide negative drug screens** over at least a 6 month period, stable housing and a safe environment for [the child] are major concerns.

(emphasis added). Moreover, we note that there was testimony offered by Ms. Lawson at trial which reflected that both times the child was removed was due to drug issues. As for the component of the court's finding that the child was removed from a home on Roane State Highway, we note that Ms. Lawson specifically stated that Mother "had an apartment on Roane State Highway" at the time the child came into the Department's custody.

We next turn to Mother's second raised issue, which challenges the ground for abandonment relied on by the Department in this case. Specifically, as developed in her brief, Mother argues that there was "no proof that the minor child was in the home of the Mother at the time of the removal." She goes on to argue that there was no proof that the child was in Mother's custody at the time of removal. Although it is true that the definition for abandonment relied on here, colloquially known as "failure to establish a suitable home," requires that a child be "removed from the home or the physical or legal custody of a parent," Tenn. Code Ann. § 36-1-102(1)(A)(ii), such a requirement does not present an impediment in this case. Indeed, as we have noted, the record contains evidence that the child's removal occurred when Mother's trial home placement was revoked. Although this ground of abandonment requires fuller consideration later in the opinion, we dispense with the narrow concern raised by Mother here.

Mother's next raised issue challenges the trial court's reliance on the substantial noncompliance with permanency plan and persistence of conditions grounds for termination. Her concern is specifically predicated upon her belief that the record lacks evidence as to the conditions of the child's removal, which she reasons are relevant to establishing both grounds for termination. Mother argues, for example, that "without evidence as to the grounds for removal, the Trial Court had no basis to find that the permanency plan or the 'persistent' conditions in the termination petition were in any way related to the removal of the minor child." We will not explore certain aspects of her legal argument any further than is necessary here[9] because the overarching argument itself is built on a faulty factual premise. Contrary to the suggestion of Mother, the record does contain evidence pertaining to the reasons for the child's removal. As we noted in our discussion of the first issue raised by Mother, evidence revealed that

---

[9] As discussed later in the opinion, the persistence of conditions ground for termination applies when, among other things, "[t]he conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent . . . **or other conditions exist** that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent." Tenn. Code Ann. § 36-1-113(g)(3)(A)(i) (emphasis added).

Mother's drug struggles are what ultimately fueled the need for removal. In this vein, we observe that Ms. Lawson's testimony indicated that both instances of the child's removal were due to drug issues, and the first permanency plan created in the present matter detailed that the trial home placement had been revoked due to Mother's noncompliance, specifically noting that Mother had an inability to provide negative drug screens. As with the ground for abandonment relied on in this case, we will examine the substantial noncompliance with permanency plan and persistence of conditions grounds for termination more fully later in this opinion.

The last issue raised by Mother involves an argument that the trial court erroneously shifted the burden to her to prove that the grounds for termination were not met. She notes, for instance, that the court made certain findings about her failure to provide proof of housing. We do not share Mother's concern. As the Department aptly explained in its brief:

> No burden shifting occurred. The permanency plans required Mother to provide proof of housing and paid rent/mortgage and utilities, comply with home visits by DCS and service providers, provide proof of employment or a source of income, and maintain contact with the Department and inform the Department of changes to her telephone, address, or employment. Therefore, Mother's failure to provide proof of these responsibilities is noncompliance with the permanency plan. The Department appropriately put on proof of Mother's noncompliance with these responsibilities.

(internal references omitted). Having now fully addressed Mother's articulated grievances, we shift our focus to a more comprehensive consideration of the grounds for termination relied on by the trial court.

*Abandonment by Failure to Establish a Suitable Home*

Pursuant to Tennessee Code Annotated section 36-1-113(g)(1), "[a]bandonment by the parent or guardian, as defined in § 36-1-102" may constitute a ground for termination. In turn, the referenced section of 36-1-102 contains several distinct statutory meanings of abandonment. As is relevant in this case, the controlling definition of abandonment is specifically located at Tennessee Code Annotated section 36-1-102(1)(A)(ii) and reads as follows:

> *(a)* The child has been removed from the home or the physical or legal custody of a parent or parents or guardian or guardians by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;

*(b)* The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and

*(c)* For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(ii).

In connection with this ground for termination, case law instructs that the concept of a home's suitability is not a narrow one limited solely to consideration of the physical structure of the parent's residence. As this Court discussed in a recent opinion:

> "A suitable home 'requires more than a proper physical living location.'" *In re Navada N.*, 498 S.W.3d 579, 595 (Tenn. Ct. App. 2016) (quoting *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014)). A suitable home requires "[a]ppropriate care and attention ... to the child." *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *7 (Tenn. Ct. App. Apr. 20, 2016). The home must also "be free of drugs and domestic violence." *In re Hannah H.*, 2014 WL 2587397, at *9.

*In re Josiah T.*, No. E2019-00043-COA-R3-PT, 2019 WL 4862197, at *7 (Tenn. Ct. App. Oct. 2, 2019).

Here, our review of the record confirms the trial court's conclusion that this ground was established by clear and convincing evidence. As we have noted, the child was removed and placed in the Department's custody in March 2018 when Mother's trial home placement was revoked. The child was thereafter adjudicated dependent and neglected, and we note that when it had removed the child, the removing court found that it was reasonable to make no efforts to maintain the child in the home based on the

- 17 -

circumstances. Specifically, the court referenced Mother's inability to come into compliance with previous court orders.

Regarding the efforts of the Department to assist Mother in establishing a suitable home and the efforts of Mother to provide one for the child, the record is clear that, in the four months following the removal and even thereafter, the Department made reasonable efforts to assist, whereas Mother failed to make reciprocal efforts. We need not tax the length of this opinion by revisiting all of the testimony that touched on the Department's efforts to assist Mother, but it is clear that there were many efforts made to assist Mother to establish a suitable home for the child. Among other things, the Department made referrals for services, developed a permanency plan with Mother, facilitated the scheduling of drug assessments, helped arrange visitation, and as it specifically concerned the need for a suitable physical home, the Department offered to pay the first month's rent and help out with furniture. Mother was also given a resource guide.

The Department's efforts to encourage and facilitate the recommended inpatient treatment for Mother's drug problems were particularly significant as it concerns this ground because, as we have noted, a suitable home requires more than an appropriate physical structure. *See id.* The home must also be free of drugs. *Id.* Here, though, Mother was repeatedly dismissive of the recommendation to attend inpatient treatment throughout the case. More than one witness testified at trial as to Mother's stated belief that she did not need as intense treatment as had been recommended. Mother's efforts to improve her situation and provide a suitable home were undisputedly weak. Her own counsel remarked at trial that there was "no doubt she's blown the deadlines in all of the permanency plans," and in his closing argument, Mother's counsel conceded that the testimony was "clear that she wasn't taking the process seriously" for the majority of the case.

The proof demonstrated that Mother lost the apartment she had at the time of the child's removal, and thereafter, her housing was inconsistent. The proof also indicated that the Department had not been allowed into a home where it discovered Mother was staying. According to Ms. Lawson, Mother had never provided an address for stable housing. There was also much concern in this case about Mother's lack of employment following her job at Waffle House.

Although Mother entered rehab approximately two weeks before trial, evidence indicated that this rehab stint was to be followed by a multi-month stay in a halfway house afterwards. Clearly, this claimed commitment to recovery, assuming it actually came to fruition, would forestall any potential reunion with the child for quite some time. Mother not only failed to establish a suitable home in the four months following removal, she also clearly was not in a position to provide a suitable home at the time of trial. This ground for termination is hereby affirmed.

*Substantial Noncompliance with Permanency Plan*

The next ground for termination involves a consideration of Tennessee Code Annotated section 36-1-113(g)(2), which allows for a termination of parental rights when "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan." Tenn. Code Ann. § 36-1-113(g)(2). This Court has previously outlined the standards pertaining to this ground as follows:

> The determination of whether there has been substantial noncompliance with a permanency plan is a question of law, to be reviewed on appeal de novo with no presumption of correctness. Termination of parental rights under Tennessee Code Annotated Section 36-1-113(g)(2) "requires more proof than that a parent has not complied with every jot and tittle of the permanency plan." To succeed under Section 36-1-113(g)(2), DCS "must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." Second, DCS must show that "the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met."

*In re Daymien T.*, 506 S.W.3d 461, 471 (Tenn. Ct. App. 2016) (internal citations omitted).

Early in this opinion, we specifically detailed the various requirements of the permanency plans entered in this case, and having reviewed the record, we are of the opinion that these requirements were reasonable and related to remedying the conditions that caused the child's removal. Given Mother's long-standing problem with drugs, the requirements aimed at addressing that concern were of especial importance. Unfortunately, Mother was dismissive of the need to address her substance abuse problem for the majority of the case, and she consistently failed drug screens. In detailing this and other areas of noncompliance on Mother's part, the trial court noted as follows in its order of termination:

> [T]he Court finds that despite taking multiple alcohol and drug assessments, she refused to follow through with any of the recommendations until 2 weeks prior to today's hearing. The Court finds that the mother did submit to random drug screens from time to time, but all of them have been positive for an assortment of illegal and non-prescribed substances and that the mother has no proof of any housing at this point. That visitation, although eventually suspended due to the effect it was having on the child, was sporatic [sic] when allowed and the phone calls allowed were not completed.

- 19 -

The trial court also referenced, among other things, that Mother still had pending criminal issues.

The evidence was clear that Mother took virtually no steps in meaningfully addressing the permanency plan requirements prior to the filing of the petition to terminate her parental rights. Indeed, whereas the termination petition was filed in February 2019, Mother's counsel acknowledged in closing argument that he was "not even going to try to insult the Court by pretending that my client made any progress before March." It is true that Mother had enrolled in rehab just before trial, but outside of that, Ms. Lawson testified that nothing had changed since Mother was found to be not in substantial compliance at an October 15, 2018 permanency plan hearing.

We are not persuaded that Mother's recent entry into rehab by the time of trial somehow altered the picture that the record clearly and convincingly painted: she was in substantial noncompliance with the permanency plan requirements. Although Mother no doubt took a few positive first steps to remedying her problem, much more remained to be done. Further, we note that this Court has oftentimes regarded belated actions on a permanency plan as "too little, too late." "This 'too little, too late' concept is often used to describe parents who, despite having an abundance of time and resources, wait until shortly before their termination hearing and then hurriedly try to comply with the obligations in their permanency plans." *In re M.J.M., Jr.*, No. M2004-02377-COA-R3-PT, 2005 WL 873302, at *10 (Tenn. Ct. App. Apr. 14, 2005). The trial court's reliance on this ground for termination is affirmed.

*Persistent Conditions*

Tennessee Code Annotated section 36-1-113(g)(3) outlines the ground for termination commonly known as "persistence of conditions." This ground applies when:

> The child has been removed from the home or the physical or legal custody of a parent . . . for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
>
> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent . . . or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent . . . ;
>
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the

near future; and

> (iii) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3)(A). The purpose behind this ground "is to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3, 2008).

Having reviewed the trial court's order, we are compelled to vacate this ground for termination. In relevant part, we observe that the trial court failed to make specific findings regarding each of the elements applicable to the persistence of conditions ground. Namely, the "likelihood that [the persistent conditions] will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future" is wholly unexamined. Tenn. Code Ann. § 36-1-113(g)(3)(A)(ii). Case law is clear that the consideration of potential remediation is an express requirement under this ground. *See In re Aaron E.*, No. M2014-00125-COA-R3-PT, 2014 WL 3844784, at *9 (Tenn. Ct. App. Aug. 4, 2014) ("[T]he trial court is required to consider the likelihood that the conditions will be remedied such that the child can be safely returned to the parent in the near future."); *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *11 (Tenn. Ct. App. June 10, 2014) (noting that the persistence of conditions ground also requires the court to find that there is little likelihood of remediation at an early date).

In previous cases, we have vacated a trial court's reliance on this ground when the likelihood of remediation was not the subject of any finding in the order of termination. As we explained in one opinion:

> The absence of appropriate findings supporting this ground for termination is not a trivial concern. With respect to termination cases, the trial court is specifically directed by statute to "enter an order that makes specific findings of fact and conclusions of law." Tenn. Code Ann. § 36-1-113(k). Because the trial court did not make specific findings regarding each of the elements applicable to the persistence of conditions ground, we are compelled to vacate the termination order with respect to this ground for termination as to both parents and, as to Father, remand for the preparation of appropriate findings of fact and conclusions of law as required by statute. *See State v. C.H.K.*, 154 S.W.3d 586, 591 (Tenn. Ct. App. 2004) (vacating ground of abandonment finding under Tennessee Code Annotated section 36-1-102(1)(A)(iv) and remanding for findings when the trial court's order failed "to set forth any findings which show either that C.H.K.

- 21 -

was incarcerated on July 18, 2002, the date D.C.S. filed its petition instituting termination proceedings, or that she was incarcerated during all or part of the four months immediately preceding that date"). Further findings as to Mother on this ground for termination are unnecessary given our ultimate disposition herein, which includes our affirmance of the termination of her parental rights.

*In re Mickeal Z.*, No. E2018-01069-COA-R3-PT, 2019 WL 337038, at *13 (Tenn. Ct. App. Jan. 25, 2019) (internal footnote omitted).

Given the absence of all findings requisite to support this ground for termination, we hereby vacate the persistence of conditions ground. Because our ultimate disposition herein includes an affirmance of the termination of Mother's parental rights, however, we need not remand for further findings.

*Best Interests*

When at least one ground for termination has been properly established against a parent, this Court shifts its focus to whether termination of the parent's parental rights is in the child's best interests. "Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest." *In re Jacobe M.J.*, 434 S.W.3d 565, 573 (Tenn. Ct. App. 2013). As such, "[w]hen at least one ground for termination of parental rights has been established, the petitioner must then prove, by clear and convincing evidence, that termination of the parent's rights is in the child's best interest." *Id.* at 572.

When conducting a best interests analysis, conflicts between the interests of the parent and child are to be resolved in "favor of the rights and best interest of the child." *Id.* at 573 (citing Tenn. Code Ann. § 36-1-101(d)). The analysis "must be viewed from the child's, rather than the parent's, perspective." *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004). In Tennessee, the General Assembly has codified a list of nine non-exclusive factors that trial courts are to consider when conducting a best interests inquiry in termination of parental rights cases. These non-exclusive factors are as follows:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear

- 22 -

possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). "Ascertaining a child's best interests does not call for a rote examination" of these factors, and "depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878.

Having carefully reviewed the record, we agree with the trial court that there is clear and convincing evidence that terminating Mother's parental rights is in the child's best interests. There are many concerns in this case, but at the forefront is Mother's long-standing problem with drugs. The record is replete with evidence pertaining to this problem and Mother's failure to take any meaningful steps to address it until two weeks before trial. Although we wish Mother well and hope she makes progress in the future, no real lasting change in her circumstances had been established by the time of trial.

Again, the essential inquiry here is what is in the best interests of the child, and based on this record, the child's interests are served by terminating Mother's rights. Mother is in no position to parent the child at this point given her unresolved drug problem, and the evidence indicates that the child is "very attached" to his foster family, which is a preadoptive home. Having carefully reviewed the record and considered the totality of the circumstances presented by it, the evidence clearly and convincingly weighs in favor of terminating Mother's parental rights.

## CONCLUSION

Although we vacate the trial court's reliance on the persistence of conditions ground for terminating Mother's parental rights, the termination of Mother's parental rights is otherwise affirmed for the reasons stated herein.

_____
ARNOLD B. GOLDIN, JUDGE