IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 5, 2024

# IN RE MYKEENA C.[1] ET AL.

**Appeal from the Circuit Court for Montgomery County**
**No. CC 2021 CV 682        Matthew Joel Wallace, Judge**

_____

## No. M2024-00206-COA-R3-PT

_____

Mother and Father appeal the termination of their parental rights to their two shared children. We conclude the trial court properly found that the Department of Children's Services proved by clear and convincing evidence at least one ground for termination as to each parent and that termination of parental rights is in the children's best interest. Accordingly, we affirm the trial court's termination of parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JEFFREY USMAN, J., delivered the opinion of the court, in which THOMAS R. FRIERSON, II, and KENNY W. ARMSTRONG, JJ., joined.

Daniel P. Bryant, Clarksville, Tennessee, for the appellant, Michael C.

Julie M. Reyes, Clarksville, Tennessee, for the appellant, Frankie W.

Jonathan Skrmetti, Attorney General and Reporter; and Mara L. Cunningham, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

Erin S. Poland, Clarksville, Tennessee, Guardian ad Litem for the minor children, Mykeena C. and Mykira C.

**OPINION**

I.

_____

[1] It is the policy of this court to protect the privacy of children in parental termination cases by avoiding the use of full names.

This appeal concerns the termination of Michael C.'s (Father) and Frankie W.'s (Mother) parental rights to Mykeena C. and Mykira C., who were twelve and nine years old respectively at the time of trial. The Circuit Court for Montgomery County found that the Tennessee Department of Children's Services (DCS) proved at least one termination ground for each parent by clear and convincing evidence and that termination was in the best interest of Mykeena and Mykira. Accordingly, the trial court terminated Mother and Father's parental rights. Both parents have appealed.

In addition to Mykeena and Mykira, Mother has three other biological children. Father, who was characterized as a stepfather to these three children, cohabitated with Mother while the three children were growing up. Disturbing events involving these children are of critical importance to the removal of Mykeena and Mykira and to the termination of Mother and Father's parental rights. Mother's three other children include a male child E.W., who is the oldest, and two twin girls, H.L.W. and H.D.W. Though younger than E.W., the twin girls are older than Mykeena and Mykira.

Years before DCS initiated termination proceedings as to Mykeena and Mykira, E.W., who was then a fifteen-year-old minor, sexually assaulted his then-twelve-year-old sister H.L.W., who as a result gave birth to a child: C.L.W. Mother testified that she was unaware that E.W. was sexually assaulting his sister "until the last minute," which, she clarified, meant that she learned this was happening at approximately the same time that DCS was informed that H.L.W. had been sexually assaulted. Mother testified that E.W. was "adjudicated" for his interactions with H.L.W., and she conceded that the evidence substantiated the sexual abuse allegations against E.W. Mother's oldest child E.W. left Mother's house to live with his biological father. This was not the only sexual assault of a minor that would occur in this house nor is it the circumstance that most directly began the removal of Mykeena and Mykira; nevertheless, the sexual assault of H.L.W. by E.W. would prove impactful in terms of the ultimate removal of Mykeena and Mykira from Mother's care.

In February 2020, DCS received a referral from a friend of Mother's alleging that Father had attempted to sexually abuse one of the twins, H.L.W., who as noted above had been previously assaulted by E.W., and that Father had sexually abused the other twin, H.D.W. One of Mother's friends reported to DCS that, while Mother was at work one evening, Mother's friend had

> received a phone call from [H.L.W.] . . ., and she was crying. [Mother's friend] reported that [H.L.W.] informed her that her stepfather, [Father] was standing at the door of the bathroom as she got out of the shower. [Mother's friend] reported that [H.L.W.] informed her that [Father] grabbed his penis, looked at her and asked [H.L.W.] was she ready. [Mother's friend] reported that [H.L.W.] immediately left the home, and call[ed] her to pick her up. [Mother's friend] reported that she asked [H.D.W.] if [Father] had touched

- 2 -

her before. [Mother's friend] reported that [H.D.W.] stated . . . [Father] makes her suck his penis. [Father] comes in her room in the middle of the night caressing her, and makes her take off her clothes. [Father] rapes her. [Mother's friend] reported that [H.D.W.] stated to her that the last time that she had sex with [Father] was in November 2019. [Mother's friend] further reported that [Father] physically abuses [Mother], and that she is scared of [Father].

During a forensic interview, H.D.W. described years of sexual abuse by Father. She indicated that the sexual abuse began when she was either nine or ten years old and continued until she was fourteen. In addition to being forced to perform oral sex upon Father, H.D.W. also described Father anally and vaginally raping her.

DCS was later informed that in 2019, prior to Mother's friend's above report, H.D.W. had told friends of hers that Father was raping her. DCS was told that late one evening H.D.W. informed her friends that she did not want to go back inside her house because Father rapes her. Mother was apprised of these allegations, but she seemingly took no action. Instead, Mother simply denied that H.D.W.'s allegations were true, insisting that H.D.W. had "lied" and that she was lying "for attention."

While DCS had been informed that Mother had disregarded the 2019 allegations of sexual assault, Mother seemed initially to be more responsive to DCS regarding the 2020 sexual assault allegations that were made against Father. Accordingly, instead of seeking to remove the children from her care, DCS worked with Mother to keep the children in her custody. An immediate protection agreement was reached between Mother and DCS so that the children would remain in Mother's care during the investigation into the sexual assault allegations against Father, who was not a party to this agreement. In structuring the agreement, DCS's primary concern was protecting the children from sexual assault and related trauma. The agreement also provided that Mother would identify any other person who she would like to supervise the children and that "[a]ll adults over the age of 18 must be approved through the department in order to reside with [Mother]." Despite the agreement providing, among other things, that Father would be barred from being in the home with the children, Mother, nevertheless, initially allowed Father to remain in the home for two weeks while he sought to find another residence.

Subsequently, new allegations were made to DCS that Father was still at times present in the home. During its investigation, DCS determined that Father was still being allowed to stay in the home months after Mother had been aware of his sexually abusive acts and after her agreement not to allow him around the children. Mother's eldest son, E.W., who as noted above had sexually assaulted one of his sisters, and another male family member who had not been approved by DCS were also alleged to be residing in the home at this point. Mother allowed the perpetrators of sexual assault against her twin daughters to be in the home with their victims and with the younger girls. Mother's actions finally

resulted in DCS removing the minor children from Mother's care.

Nevertheless, DCS again tried to work with Mother, including granting overnight visitation starting in September 2020. However, one month later this overnight visitation was suspended. Overnight visitation never resumed. DCS determined that Mother was still allowing E.W., who had sexually assaulted his sister H.L.W., to visit, including staying overnight. In fact, E.W. was being allowed to watch his sisters while Mother was out of the house for work. Mother also allowed her brother, who had not been approved by DCS, to reside in the home. Mother conceded that she had left the children in the care of E.W. multiple times despite knowing that she was not supposed to do so. At the time of trial, despite asserting that she would no longer allow E.W. around the children if they were returned to her, E.W. was still staying at Mother's home as an overnight visitor. At the dependency and neglect hearing, the trial court determined that Father had perpetrated sexual abuse, and Mother stipulated to the facts underlying the dependency and neglect petition.

In addition to the above-discussed circumstances of the home, Mother also regularly failed her drug screenings. She generally failed the drug screenings as a result of marijuana usage, which she indicated she used daily. Mother conceded to using marijuana as a sleep aid and because she has "got a lot going on." Mother also twice tested positive for cocaine, though she denied purposefully using cocaine. Mother did, however, regularly visit with Mykeena and Mykira after their removal from her custody. Although he no longer resided in the home, Mother also maintained a relationship with Father.

Father did not visit Mykeena and Mykira after they were brought into DCS custody. Father was not incapacitated during this time. While Father asserts that DCS prevented contact with the girls, DCS argues that Father had the possibility of therapeutic visitation with Mykeena and Mykira if Father had followed the proper steps, which DCS asserts he failed to do. The trial court noted that Father indicated that one of the reasons that he did not see the children was "because he did not want them to be upset if he visited them for only a short period of time and the children then had to return to their foster homes." In addition to providing proof of housing and employment to DCS, Father was required to complete a clinical assessment and psychosexual assessment. Father failed to do any of the above.

Initially, Mykeena and Mykira lived in the same foster home with their older twin sisters until the twins aged out of foster care. The mere mention of Father induced panic attacks; Mykira has needed intensive therapy. Mykeena and Mykira also suffered through behavioral difficulties in being together, fighting constantly, which resulted in their being separated. The two improved after being separated. Both have been making significant strides in foster care. While Mykeena and Mykira noted that they care for their Mother, neither wants to return to her.

- 4 -

In June 2021, DCS petitioned to terminate Mother's and Father's parental rights. Initially, in addition to seeking to terminate Mother's and Father's parental rights as to Mykeena and Mykira, DCS had also sought to terminate Mother's parental rights as to the twins as well as the parental rights of the twins' father. However, after the twins aged out of foster care, DCS dropped its pursuit of termination of parental rights as to the twins. A trial was held on January 2, 2024, regarding DCS's petition to terminate Mother's and Father's parental rights as to Mykeena and Mykira. The trial court ruled on January 10, 2024. The trial court determined that clear and convincing evidence established three grounds for termination of parental rights as to both Mother and Father including substantial noncompliance with the permanency plans, persistence of conditions that led to removal, and failure to manifest an ability and willingness to assume custody. Regarding Father, the trial court also found the additional ground that Father had abandoned the children by failure to visit. The trial court assessed the statutory factors in considering the best interest of both Mykeena and Mykira and determined that by clear and convincing evidence termination of parental rights is in their best interest. Both Mother and Father have appealed from that decision. They filed a joint brief on appeal in this case opposing the termination of their parental rights.

II.

Parents have a fundamental constitutional interest in the care and custody of their own children. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). This fundamental interest is "far more precious than any property right." *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016) (quoting *Santosky v. Kramer*, 455 U.S. 745, 758-59 (1982)). "[P]ublic policy strongly favors allowing parents to raise their biological or legal children as they see fit, free from unwarranted governmental interference." *In re Bernard T.*, 319 S.W.3d 586, 597 (Tenn. 2010). However, a parent's rights are not absolute and may be terminated on clear and convincing evidence that statutory grounds for termination exist and that termination is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c)(1)-(2); *In re Adoption of Angela E.*, 402 S.W.3d 636, 639 (Tenn. 2013).

In a termination of parental rights case, we review the trial court's findings of fact de novo on the record with a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *see* Tenn. R. App. P. 13(d). "In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re Bernard T.*, 319 S.W.3d at 596-97). The grounds for termination and the determination that termination is in the child's best interest must be established by clear and convincing evidence, that is, evidence that "enables the fact-finder to form a firm belief or conviction regarding the truth of the facts" and that "eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard*

*T.*, 319 S.W.3d at 596; Tenn. Code Ann. § 36-1-113(c). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

III.

As noted above, the trial court found that DCS presented clear and convincing evidence that established multiple grounds for termination of parental rights. Regarding Mother, the trial court found three termination grounds: substantial noncompliance with a permanency plan, persistent conditions, and failure to manifest an ability and willingness to assume custody. Regarding Father, the trial court found four termination grounds: abandonment by failure to visit, substantial noncompliance with a permanency plan, persistent conditions, and failure to manifest an ability and willingness to assume custody.

On appeal, DCS concedes that it presented insufficient evidence before the trial court to establish substantial noncompliance with the permanency plans against either Mother or Father. DSC notes its failure to admit into evidence each version of the ratified permanency plans for Mother and Father.[2] When DCS concedes a ground for termination found by the trial court on appeal, this court reverses the trial court's decision as to the conceded ground. *See, e.g.*, *In re J.S.*, No. M2022-00142-COA-R3-PT, 2023 WL 139424, at *6 & n.6 (Tenn. Ct. App. Jan. 10, 2023), *perm. app. denied* (Tenn. Apr. 4, 2023) (collecting cases). Accordingly, substantial noncompliance by both Mother and Father with regard to the permanency plans cannot stand as a ground for termination of parental rights as to either Mother or Father in this case.[3]

---

[2] This court has repeatedly concluded that a parent's permanency plan must be entered into evidence to sustain the substantial noncompliance ground. *See, e.g., In re Dyllon M.*, No. E2020-00477-COA-R3-PT, 2020 WL 6780268, at *7-8 (Tenn. Ct. App. Nov. 18, 2020) (collecting cases) (explaining that "[w]ithout each permanency plan in the record, the lower court and this Court are unable to determine whether a parent complied with the responsibilities in the permanency plans").

[3] In seeking termination of Father's parental rights, DCS also included in its petition severe abuse as ground for termination. The dependency and neglect proceedings resulted in a determination that severe abuse was perpetrated by Father. This court has repeatedly addressed the res judicata impact of such determinations. *See, e.g., In re Colten B.*, No. E2024-00653-COA-R3-PT, 2025 WL 252663, at *5-6 (Tenn. Ct. App. Jan. 21, 2025). While the trial court's order notes the finding of severe abuse in the dependency and neglect proceedings and is replete with references to the trial court's understanding that Father perpetrated severe sexual abuse of a minor child, the trial court did not actually set forth severe abuse as a statutory ground for termination of Father's parental rights. This appears to be an oversight in the trial court's order, but one that was left uncorrected and unaddressed by DCS before the trial court. In its briefing on appeal, DCS concedes this oversight and that the ground of severe abuse is not properly before this court. Accordingly, given DCS's concession, we decline to consider severe abuse as a separate independent ground for termination of Father's parental rights.

We consider each of the other termination grounds found by the trial court. We begin with considering the abandonment by failure to visit ground, which was asserted against and found only as to Father. We then consider the persistent conditions and failure to manifest an ability and willingness to assume custody grounds, which were found as to both Mother and Father.

A. Abandonment by Failure to Visit

The trial court found that DCS presented clear and convincing evidence that Father abandoned the children by failing to visit them. *See* Tenn. Code Ann. § 36-1-113(g)(1) (effective Apr. 22, 2021, to Jun. 30, 2021).[4] Abandonment occurs when a parent fails to visit his or her child "[f]or a period of four (4) consecutive months immediately preceding" the filing of the termination petition. Tenn. Code Ann. § 36-1-102(1)(A)(i) (effective Mar. 6, 2020, to Jun. 30, 2021). Here, it is undisputed that Father did not visit the children during the four-month period immediately preceding the filing of the termination petition, meaning Father's conduct fits the statutory definition of abandonment. *See id.*

On appeal, Father concedes that he failed to visit Mykeena and Mykira; however, he asserts that this failure to visit resulted from his inability to visit the girls due to a no-contact court order. Insofar as his argument is an assertion of error by the trial court in finding abandonment by failure to visit, his argument is a form of asserting a lack of willfulness in his failure to visit. DCS disputes Father's contention, noting that the no-contact order applied to the twins but not Mykeena and Mykira. Furthermore, DCS asserts that Father had the possibility of engaging in therapeutic visitation with Mykeena and Mykira if he had taken the appropriate steps to make such visitation possible. DCS asserts Father bears the responsibility for his failure to comply with these conditions precedent to visiting with Mykeena and Mykira.

Concerning the defense of lack of willfulness, Tennessee Code Annotated § 36-1-102(1)(I) provides:

> [I]t shall be a defense to abandonment . . . that a parent or guardian's failure to visit or support was not willful. The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence. The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure[.]

As this Court has explained regarding the procedural requirements for raising the

---

[4] *See In re J.S.*, 2023 WL 139424, at *6 ("This court applies the versions of the parental termination statutes in effect on the date the petition was filed.").

willfulness defense:

> Absence of willfulness must be raised as an affirmative defense pursuant to Tenn. R. Civ. P. 8.03. Tenn. Code Ann. § 36-1-102(1)(I). Rule 8.03 provides that in raising an affirmative defense in a responsive pleading, "a party shall set forth affirmatory facts in short and plain terms relied upon to constitute" the defense. Tenn. R. Civ. P. 8.03.

*In re Brylan S.*, No. W2021-01446-COA-R3-PT, 2022 WL 16646596, at *6 (Tenn. Ct. App. Nov. 3, 2022). "As a general rule, a party waives an affirmative defense if it does not include the defense in an answer or responsive pleading." *Pratcher v. Methodist Healthcare Memphis Hosps.*, 407 S.W.3d 727, 735 (Tenn. 2013) (citing Tenn. R. Civ. P. 12.08).

Tennessee Rule of Civil Procedure 15.02 allows a court to address an affirmative defense not raised in an answer if the parties tried the defense by express or implied consent. *In re Glenn B.*, No. M2023-00096-COA-R3-PT, 2023 WL 8369209, at *10 n.9 (Tenn. Ct. App. Dec. 4, 2023) (collecting cases). "Implied consent hinges on the issues that were actually litigated by the parties . . . ." *McLemore v. Powell*, 968 S.W.2d 799, 803 (Tenn. Ct. App. 1997); *see also In re Glenn B.*, 2023 WL 8369209, at *10 n.9. That is, "implied consent arises from the parties and trial court understanding something to be at issue and actually litigating it." *In re Glenn B.*, 2023 WL 8369209, at *10 n.9 (citing *Branch Banking & Trust Co. v. Hill*, 582 S.W.3d 221, 236 (Tenn. Ct. App. 2019)). Where the absence of willfulness is properly before the trial court as an affirmative defense, this defense "must be established by a preponderance of the evidence" and the evidence need not rise to the level of being clear and convincing. Tenn. Code Ann. § 36-1-102(1)(I).

Father did not plead lack of willfulness as an affirmative defense. The issue of willfulness was also not addressed by the parties and considered by the trial court as a result of express consent to try this issue. Additionally, from our review of the record, it is not clear that willfulness was tried by implied consent. There is not a single usage of the term "willfulness" that appears in the transcript from the trial proceedings, though "willfully" is used once in relation to failure to pay support in defense counsel's closing. Additionally, nowhere do the terms "willfulness" or "willfully" appear in the trial court's order. Insofar as evidence related to willfulness was presented, this evidence overlapped with the question of visitation in relation to the best interest analysis. If willfulness was not tried by consent, then this defense would be deemed waived. *See, e.g.*, *In re Layton S.*, No. W2024-00973-COA-R3-PT, 2025 WL 1088253, at *8 (Tenn. Ct. App. Apr. 11, 2025); *In re Avyona P.*, No. M2024-00180-COA-R3-PT, 2024 WL 4863873, at *5 (Tenn. Ct. App. Nov. 22, 2024); *In re Aubrianna O.*, No. E2023-00842-COA-R3-PT, 2024 WL 2723755, at *4 (Tenn. Ct. App. May 28, 2024).

Assuming for purposes of argument that this issue was tried by consent, and there

were arguments advanced by counsel, evidence, and findings from the trial court that indicate willfulness may have been tried by consent, then Father's own testimony, nevertheless, proves deeply problematic for his position on appeal. While Father's testimony as to visitation is muddled, he indicated in part of his contradictory testimony that he did not want to visit with or see Mykeena and Mykira because he "didn't want them . . . to be thinking that they were going to be able to leave with me and they wasn't because that's what happened with their mother." In response to questioning by the DCS's attorney, Father also conceded that, after the removal of Mykeena and Mykira in 2020, his failure to visit had been his "choice" and was related to his not wanting the girls to cry because they could not come home with him. The trial court noted this testimony and determined that Father "chose not" to visit. The trial court observed Father testify in person and evidently accepted this aspect of Father's testimony as being truthful.

As noted above, the record supports the trial court's conclusion by clear and convincing evidence that Father abandoned by failure to visit Mykeena and Mykira. Additionally, the defense of lack of willfulness appears to have been waived, but as a cautionary measure, we note that even if the defense was not waived, then the record still supports the trial court's finding that Father did not want to visit Mykeena and Mykira as a result of Father's perception that they would be upset because they could only visit with him for a short time before returning to their foster homes and that this would make the girls sad. Accordingly, we conclude the trial court did not err in determining the evidence established the ground for termination of abandonment by failure to visit by Father.

## B. Persistent Conditions

The trial court also concluded that DCS presented clear and convincing evidence to establish the ground of persistent conditions as to both Mother and Father. Parental rights may be terminated for the persistence of conditions when:

> (3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
>
> > (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
> >
> > (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

> > (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;
>
> > (B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard;

Tenn. Code Ann. § 36-1-113(g)(3) (effective Apr. 22, 2021, to Jun. 30, 2021).

"The failure to remedy the conditions which led to the removal need not be willful." *In re Navada N.*, 498 S.W.3d 579, 606 (Tenn. Ct. App. 2016); *see also*, *e.g.*, *In re B.D.M.*, No. E2022-00557-COA-R3-PT, 2023 WL 3019005, at *11 (Tenn. Ct. App. Apr. 20, 2023). "A parent's continued inability to provide fundamental care to a child, even if not willful, . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re Daymien T.*, 506 S.W.3d 461, 473 (Tenn. Ct. App. 2016) (quoting *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008)). Accordingly, "this termination ground is not dependent on a parent's efforts to improve the circumstances that led to a child's removal. Rather, the focus lies on the results of those efforts." *In re Jeremiah B.*, No. E2022-00833-COA-R3-PT, 2023 WL 2198864, at *8 (Tenn. Ct. App. Feb. 24, 2023); *see also In re Audrey S.*, 182 S.W.3d 838, 874 (Tenn. Ct. App. 2005) (noting that this "ground for termination [is] focused on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them").

Here, it is undisputed that the Children were removed from Mother's and Father's care for at least six months by court order after having been declared dependent and neglected children by the Juvenile Court, satisfying the threshold requirement for this ground. Accordingly, the trial court's next task was to consider the criteria outlined above in subsections -113(g)(3)(A)(i-iii).[5]

The trial court noted that the condition that led to the removal of Mykeena and Mykira was Father's severe child abuse directed at another child in the home and Mother's

---

[5] Father, citing *In re Elijah R.*, No. E2020-01520-COA-R3-PT, 2021 WL 2530644 (Tenn. Ct. App. Jun. 21, 2021), asserts that the persistent conditions ground is inapplicable to him because "the [Children were] never in his custody . . . [and] DCS stated that paternity was never established." However, Father's name appears on the birth certificates for both girls. Furthermore, the trial court found that Mother and Father lived together for approximately 15 years until he departed the home after the sexual assault allegations. Moreover, as this court noted in *In re Elijah R.*, the General Assembly has, since 2018, merely required that a child at least be "removed from the home *or the physical or legal custody* of a parent" in order for this ground to be applicable. 2021 WL 2530644, at *10 (quoting Tenn. Code Ann. § 36-1-113(g)(3)) (emphasis in original). Here, the record clearly supports a conclusion that Father had legal and/or physical custody of the Mykeena and Mykira prior to the entry of the dependency and neglect order, which is sufficient to make this ground applicable to Father. *See id.*

failure to protect. Having heard the evidence, the trial court concluded, and the record supports, that Father "has yet to address the issues of sexual abuse in his life, such that this remains a risk in the home." Regarding Mother, the trial court found that Mother "continues to remain in a relationship with [Father], thereby demonstrating that her failure to protect the children from him is ongoing." The record also indicates, and the trial court found that Mother has continued to allow E.W. to stay overnight in the home. Mother, who works nights, has also had E.W., who had previously sexually assaulted and impregnated one of her then-twelve-year-old daughters, watch the children while she worked. Questioned about her reliance on E.W. for childcare, Mother was unable to provide any indication of a workable and safe alternative plan. In other words, the record supports the conclusion that Mother failed to take adequate steps to protect her children from perpetrators of sexual violence against them.

Mother and Father also assert that it is not clear that Mykeena and Mykira will be adopted out of their current placements. That is not, however, in and of itself a prerequisite to sustaining this ground. *See, e.g., In re Jaidon S.*, No. M2021-00802-COA-R3-PT, 2022 WL 1017230, at *8 (Tenn. Ct. App. Apr. 5, 2022), *perm. app. denied* (Tenn. Apr. 25, 2022); *In re L.F.*, No. M2020-01663-COA-R3-PT, 2021 WL 3782130, at *9 (Tenn. Ct. App. Aug. 26, 2021). Instead, the statute is only concerned with the question of whether returning the Children to Mother's and Father's care would frustrate their "early integration into a safe, stable, and permanent home." *See* Tenn. Code Ann. § 36-1-113(g)(3)(A)(iii). Here, that would be the case. Mykeena and Mykira are doing well in their foster care placements. *See id*. Their prospects of a safe, stable, and permanent home are greatly diminished by maintenance of Mother and Father's parental relationship.

Based upon our review of the record, we conclude that the trial court did not err in finding a persistence of conditions by clear and convincing evidence.

### C. Failure to Manifest an Ability and Willingness to Assume Custody

The trial court also stated in its order that clear and convincing evidence supported the ground for termination that Mother and Father failed to manifest an ability and willingness to assume custody of the Children. *See* Tenn. Code Ann. § 36-1-113(g)(14). To satisfy this ground, two prongs must be proven by clear and convincing evidence: (1) the parent or legal guardian failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and (2) placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child. *Id.*; *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020).

The Tennessee Supreme Court has indicated that the statute places a "conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child." *In re Neveah*

- 11 -

*M.*, 614 S.W.3d at 677. Failure of the parent to manifest either ability or willingness will satisfy the first prong. *Id.* "Ability focuses on the parent's lifestyle and circumstances," while willingness revolves around a parent's attempts "to overcome . . . obstacles" preventing the parent from assuming custody. *In re Serenity W.*, No. E2018-00460-COA-R3-PT, 2019 WL 511387, at *6 (Tenn. Ct. App. Feb. 8, 2019). A parent's express desire to reunite with the child is insufficient to establish a willingness to assume custody. *See In re Nicholas C.*, No. E2019-00165-COA-R3-PT, 2019 WL 3074070, at *17 (Tenn. Ct. App. July 15, 2019). To the contrary, "[w]hen evaluating willingness, we look for more than mere words." *In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at *5 (Tenn. Ct. App. Oct. 26, 2018). This court instead considers a parent's efforts to overcome any obstacles standing in the way of assuming custody or financial responsibility. *In re Jaxx M.*, No. E2018-01041-COA-R3-PT, 2019 WL 1753054, at *9 (Tenn. Ct. App. Apr. 17, 2019) (quoting *In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *8 (Tenn. Ct. App. Mar. 22, 2019)). A failure to make efforts to overcome such obstacles "can undercut a claim of willingness." *Id.* As for the second prong, a substantial risk of harm requires "a real hazard or danger that is not minor, trivial, or insignificant" and requires the harm to be more than a "theoretical possibility" to be "sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not." *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001); *see In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018).

The trial court expressly found an absence of an ability and willingness to assume custody as to both Mother and Father, and it found that placing Mykeena and Mykira in Mother's and Father's physical and legal custody would pose a risk of substantial harm to the girls. While the trial court's order would have better facilitated review on appeal through greater precision in this section of its opinion in relation to these conclusions, it is apparent from our review of the order in its entirety that these findings are predicated upon the trial court's findings regarding the continuing danger of Father's sexual violence and Mother's failure to adequately safeguard her children from perpetrators of sexual violence. Whether characterized as a matter of willingness or ability, the record supports the trial court's conclusion by clear and convincing evidence. The record also supports the trial court's conclusion that the children would face a risk of substantial harm if returned to Mother's and Father's custody. Accordingly, we find no error in finding this ground for termination applicable to Mother and Father.

## IV.

Having concluded that at least one statutory ground for termination of parental rights has been shown against Father and Mother by clear and convincing evidence, our focus shifts to what is in the children's best interest. *See In re Audrey S.*, 182 S.W.3d at 877. The Tennessee Supreme Court has summarized the law regarding the best interest analysis as follows:

Facts considered in the best interest analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interests." When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ."

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017) (citations omitted).

The nonexclusive factors relevant to the best interest analysis are laid out in Tennessee Code Annotated section 36-1-113(i)(1):

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

- 13 -

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(i)(1) (effective Apr. 22, 2021, to June 30, 2021).

Assessing the circumstances of this case through the lens of the statutory factors, the trial court concluded that terminating Mother's and Father's parental rights was in Mykeena and Mykira's best interest. In support of this conclusion, the trial court made the following findings:

**(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;**

These children have been in foster care for a number of years, and the court finds that termination of the parental rights of [Father] and [Mother] would certain[ly] not have a negative effect on stability and continuity of placement. This factor favors termination.

**(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;**

Again, these children have been in foster care for a number of years. The court finds that a change could compromise their emotional or psychological wellbeing. This factor favors termination.

**(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;**

More so in [Father]'s case, the court cannot find that he has done much over a larger period of time to meet the children's needs. While it is less so in [Mother]'s case, this factor still favors termination.

**(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;**

No proof exists before the court in this case that such an attachment exists, no proof exists that there is a reasonable expectation of either parent creating such attachment. The factor favors termination.

**(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;**

[Father] clearly has not had any visitation with these children. [Mother] has exercised court-ordered time. With regard to [Father], this factor favors termination. With regard to [Mother], this factor does not favor termination.

**(F) Whether the child is fearful of living in the parent's home;**

The court cannot find proof related to this factor; therefore, it does not favor termination.

**(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;**

Based on the testimony of all witnesses, the court finds there is a likelihood that these types of triggers would exist with regard to trauma and post-traumatic symptoms. As such, this factor favors termination.

**(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;**

. . . [T]he court finds a healthy parental attachment exists for these children with their respective foster parents. As such, this factor favors termination.

**(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;**

These children have relationships with both foster siblings and biological siblings or step-siblings. The factor neither favors [n]or disfavors termination.

**(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;**

[Mother]'s drug usage falls into this category, and her continued drug usage would be a factor in favor of finding termination to be in the best interests. One of the key words here in "lasting." [Father] put forth some proof related to current positive circumstances in his conduct or conditions. But it is so short in duration that it is not lasting. This factor favors termination.

**(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;**

More so than [Father], [Mother] has indeed taken advantage of some such services. With regard to [Father], this factor favors termination. With regard to [Mother], this factor does not favor termination.

**(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;**

[Father], more so than [Mother], argues that DCS has done little to nothing to help him exercise visitation, receive services and the like. It is hard to find proof that this is the case. Even if it was the case, . . . that this factor alone does not favor termination would not be enough to overcome the multiple other findings in favor of termination.

**(M) Whether the parent has demonstrated a sense of urgency in**

**establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;**

I sense no urgency, and find no proof of same, on the part of either party to address the *major* issues that exist in this matter. This factor favors termination.

**(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;**

This factor clearly favors termination in that [Mother] has allowed sexual abuse to occur to one of her older daughters, not subject to this petition due to her reaching the age of majority. That sexual abuse was perpetrated by one of [Mother]'s other children, again . . . not subject to this petition due to her reaching the age of majority. Later, for whatever reason, [Mother] allowed the perpetrator to watch or supervise the children that are the subject of this petition.

**(0) Whether the parent has ever provided safe and stable care for the child or any other child;**

This factor does not favor termination, in that, at least at some point, [Father] and [Mother] provided these children or other children safe and stable care.

**(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;**

It is difficult for the court to find proof that meets [Father] and [Mother]'s burden in showing that either has a true understanding of what is required for these children. This is not meant to be dismissive of either [party's] efforts, but those efforts have not been enough. This factor favors termination.

**(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;**

The conclusion reached in factor (P) is the same here.

**(R) Whether the physical environment of the parent's home is healthy and safe for the child;**

- 18 -

Though [Mother] testifies that her home would be healthy and safe, it is hard for the court to credit that testimony because of a.) the testimony regarding [Mother] allowing [someone] who has been indicated for sexual abuse to supervise these children, and b.) the length of time these children have been out of the parents' home.

**(S) Whether the parent has consistently provided more than token financial support for the child; and**

While there is some child support now being paid, it has only recently been paid. In looking at the totality of support paid and the larger timeline of when support has or has not been paid, the court finds it is not consistently provided. This factor favors termination.

**(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.**

The court cannot in good consc[ience] find either parent would be able to provide safe and stable care, particularly given the sexual abuse circumstances outlined herein. This factor favors termination.

Having considered the statutory factors, ultimately, the trial court concluded that "it is in the best interest of these children that [Father's] and [Mother]'s parental rights be terminated. Further, the proof established, by clear and convincing evidence, that termination of the parental rights of [Father] and [Mother] is in . . . best interest" of Mykeena and Mykira.

In considering this decision, the determination of a child's best interest "may not be reduced to a simple tallying of the factors for and against termination." *In re Chayson D.*, No. E2022-00718-COA-R3-PT, 2023 WL 3451538, at \*15 (Tenn. Ct. App. May 15, 2023). Rather, a court must determine, after completing a holistic assessment of the record, whether terminating a particular parent's rights would be in a particular child's best interest. *Id.*

Having reviewed the record and trial court's findings, while there are individual factors as to which the trial court's analysis could be questioned, the correctness of the trial court's ultimate assessment and the thrust of its analysis is well-reasoned and supported by the record. Father engaged in sexual abuse of one of Mother's minor children over the course of several years and sought to sexually abuse another of Mother's minor children. Mother allowed Father to be in the home with his victims and the children subject to the petition after Mother had become aware of Father's acts of sexual assault and after she

reached an agreement with DCS to not allow such contact. After the children were removed from Mother's care following Father's presence in the home, DCS again sought to work with Mother including through overnight visitation. Mother, however, again exposed minors to an individual, in this instance her oldest son, who previously perpetrated acts of sexual assault against one of Mother's children. Not only did Mother expose the children, she left minor children in the actual care of her oldest son, who watched them while she worked. Father has taken no clear action to address his deeply troubling history of sexual violence towards minors. During the trial, it became apparent that Mother's oldest son is still an overnight visitor in Mother's home. The victim of the son's sexual assault, who has aged out of foster care, resides in this home. The mere mention of Father has been enough to cause panic attacks in Mykeena and Mykira, and while Mykeena and Mykira both care about Mother, neither wishes to be returned to her care. Alternatively, Mykeena and Mykira are both doing well and progressing, including with their emotional health and wellbeing, in foster care. It is the best interest of the child and not the parent that is to be considered, and we conclude the trial court quite properly determined that clear and convincing evidence supports the conclusion that it is in Mykeena and Mykira's best interest to terminate Father's and Mother's parental rights.

V.

For the reasons discussed above, we affirm the judgment of the trial court in terminating Mother and Father's parental rights. The costs of the appeal are taxed to the Appellants, Michael C. and Frankie W., for which execution may issue if necessary. The case is remanded for further proceedings consistent with this opinion.

s/ Jeffrey Usman
JEFFREY USMAN, JUDGE